# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

PAUL WESLEY BAKER,
Defendant and Appellant.

S170280

Los Angeles County Superior Court
LA045977

---

February 1, 2021

Chief Justice Cantil-Sakauye authored the opinion of the Court, in which Justices Corrigan, Liu, Cuéllar, Kruger, Groban and Hull* concurred.

Justice Liu filed a concurring opinion.

---

_____

\* Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. BAKER

S170280


Opinion of the Court by Cantil-Sakauye, C. J.


Judy Palmer told a friend that she was afraid of defendant Paul Wesley Baker and that "if anything happened to her," "he did it." Within a few weeks, Palmer disappeared. Her body was found in the desert several weeks later, severely decomposed. A jury convicted defendant of first degree murder, among several other offenses. The jury also found true two special circumstance allegations — rape and burglary — and returned a verdict of death at the close of the penalty phase. This appeal is automatic. Aside from correcting an error in the abstract of judgment, we affirm.

## I. BACKGROUND

### A. Guilt Phase

This case involves three sets of charged offenses. The first concerns Judy Palmer. A jury convicted defendant of first degree murder (count 1); forcible rape (count 2); first degree residential burglary (count 3); grand theft auto (count 4), regarding a Ford Escort that Palmer's son provided for her use; unlawful driving or taking of a vehicle (count 5), regarding the same automobile; and unlawful driving or taking of a vehicle (count 14), regarding a Ford Ranger loaned to Palmer by her employer after the Escort disappeared. (Pen. Code, §§ 187, subd. (a) [murder], 261, subd. (a)(2) [rape], 459–460 [burglary], 487, subd. (d)(1) [grand theft]; Veh. Code, § 10841, subd. (a) [unlawful driving or taking].) The jury found defendant not

guilty of sexual penetration by foreign object (count 15). (Pen. Code, § 289, subd. (a)(1).) In connection with the murder, the jury found true two special circumstance allegations (rape and burglary) and found not true one additional special circumstance allegation (sexual penetration by foreign object). (*Id.*, § 190, subd. (a)(17)(C) [rape], (a)(17)(G) [burglary], (a)(17)(K) [foreign object].) The jury also found that the rape (count 2) was committed during a residential burglary and found true a multiple victim allegation. (*Id.*, § 667.61.)

The second set of charged offenses concerns crimes that the jury found defendant committed against women other than Palmer: forcible rape (count 6) and sodomy by use of force (counts 7 and 16) regarding Kathleen S.; and sodomy by use of force (count 10) regarding Lorna T. (Pen. Code, §§ 261, subd. (a)(2) [rape], 286, subd. (c)(2) [sodomy].) The jury found true a multiple victim allegation in connection with each of these offenses. (*Id.*, § 667.61.) The jury also found true a great bodily injury allegation in connection with the rape offense (count 6) and one sodomy offense (count 7) concerning Kathleen S.

The third and final set of charged offenses concerns crimes, regarding women other than Palmer, of which defendant was acquitted. The trial court entered a judgment of acquittal regarding the alleged forcible rape of Monica H. (count 12) after she did not appear to testify. (See Pen. Code, § 1118.1.) The jury acquitted defendant of two counts of sodomy by force (counts 9 and 13) regarding Laura M. and one count of forcible rape (count 11) regarding Susanne K. The operative charging document did not include a count 8.

### 1. Prosecution case

#### a. Relationship between Palmer and defendant

Judy Palmer was a sixty-year-old grandmother at the time of her disappearance on April 17, 2004. She was an active participant in Alcoholics Anonymous (A.A.), sober for nearly 28 years, and "dedicated a large amount of her time to helping" others in the program.

Palmer met defendant through A.A. He was roughly 17 years her junior and very strong. Testimony suggested that the pair became friends around 2000, began dating no sooner than 2001, and started living together in Palmer's apartment no later than 2002. The relationship was on-again, off-again. It appears Palmer and defendant separated at some point in 2003 and reconciled by early 2004.

Defendant worked as a handyperson to earn a living. In early 2004, Palmer's son Robert hired defendant to perform work in Robert's home, at defendant and Palmer's request. Defendant was dissatisfied with the compensation he received and told Robert "he could really hurt my mom."

On March 11, 2004, there was an incident at a storage facility. Palmer and defendant shared a storage unit beginning around September 2003. A manager at the facility saw defendant there several times without Palmer; the manager recalled him having visited "pretty much every day" since the unit had been rented, often with his dog. At some unspecified time before March 11, defendant appeared without the dog, and the manager inquired about it. The manager testified that defendant said, " '[s]he's got it and if I ever want the dog back, I'll probably have to kill her to get it.' " The manager understood defendant to be referring to Palmer.

Palmer appeared at the storage facility in person to make a payment on March 11. Initially, defendant did not seem to be with her. The manager told her that defendant " 'made a remark that if he wanted [the dog] back, he would have to kill you for it.' " The manager testified that Palmer looked at her and started shaking. Defendant appeared immediately after the manager's comment. The manager told him she thought his comment about the dog referred to Palmer. Defendant grabbed Palmer "and just kind of pinched her real hard"; the manager related that Palmer "kept looking at me real scared."

Palmer's birthday was around that time. Her daughter Tammy hosted a birthday party on approximately March 11 or 12. Palmer was sitting at a table. Defendant came up behind her and laid his forearm and fist in front of her. She flinched. According to Tammy, defendant said, " 'I know you want to marry me.' And [Palmer] said, 'the hell I do.' " Defendant, laughing, asked, " 'Why don't you tell her what I gave you for your birthday?' " When Palmer did not reply, he added, " 'Come on. Come on. Tell her what I gave you. It's pretty and it's pink.' " Defendant continued laughing. Palmer sat silently, then retreated to the bathroom, crying. Other evidence adduced at trial supported an inference that the pink item to which defendant referred was a vibrator relevant to the sexual penetration by foreign object count and special circumstance allegation. Palmer had told Tammy years earlier that sex toys "grossed her out" and "demeaned the act of making love."

Within a few days of the party, Palmer told Tammy that she (Palmer) and defendant were having problems and that she did not want him in her apartment anymore. Tammy's understanding was that defendant moved out some time during the week following the party and "was out on the street."

Palmer's relationship with defendant had ended by early April 2004. On April 3 — two weeks before Palmer disappeared — defendant called Tammy's home landline telephone. Tammy described him as "very frantic to speak to" Palmer. Although Palmer was present, Tammy refused. Tammy and Palmer had previously discussed Palmer "trying very hard not to see" defendant; he had been calling Palmer and "showing up at places," including Palmer's home. After Tammy hung up the landline, her cell phone rang. It was defendant, again. She refused to let him speak with Palmer, again. Palmer nodded, suggesting agreement with the refusal. At some point, Palmer remarked, "I wish the asshole would leave me alone" — the kind of language Tammy said Palmer used only when "very angry."

On April 5, defendant was arrested in Palmer's apartment and taken into custody. Palmer's hearsay statement, admitted only as relevant to the state of mind of the testifying officer, indicated that defendant had forced himself into her apartment; other hearsay, admitted without at least contemporaneous limitation, was to similar effect. Trial testimony indicated that officers responded at around 10:00 p.m. that night to a call regarding a domestic disturbance. After they entered Palmer's apartment, defendant removed a narcotics pipe from a pocket of his shorts. He was arrested for possession of that paraphernalia. Officers also recovered a set of keys to Palmer's apartment from his underwear. Two days after the incident, on April 7, defendant was served with a restraining order restricting his contact with Palmer. At some point around this time, roughly between April 3 and April 10, Palmer told a friend "that she was afraid of him and that if anything happened to her that — to look at him, that he did it."

### b. *Events preceding Palmer's disappearance*

Defendant was released from custody shortly after 4:00 p.m. on Wednesday, April 14, 2004. A Ford Escort that Palmer's son Robert provided for her use went missing by the next day. That vehicle is the one at issue in counts 4 (grand theft auto) and 5 (unlawful driving or taking).

Palmer called her boss on Thursday, April 15, and informed him that she lacked transportation to work. Her boss loaned her a white 2002 Ford Ranger pickup truck used by the company that employed them. That truck is the vehicle at issue in count 14 (unlawful driving or taking). At the time the truck was loaned to Palmer, it had a metal toolbox with "a diamond-plate type finish." Palmer decided to park it away from her regular parking spot, fearing that defendant, whom she believed had stolen the Escort, would steal the Ranger as well.

That same day, around 10:00 or 10:30 a.m., defendant called his acquaintance Daniel Mengoni. Mengoni and defendant had used substances together "[a] dozen" times, "maybe more," including cocaine and alcohol. Defendant informed Mengoni that he (defendant) had a car for him (Mengoni). Mengoni was to pay for the car with drugs. Defendant turned over the car before noon. It was a white Ford Escort in good condition, with "women's clothes in the trunk and A.A. material." Mengoni gave defendant about $50 worth of crack, hoping to use the car for at least a day. Defendant gave Mengoni a key and informed him that he (defendant) "never" wanted the car back.

The next night (Friday, April 16), around 9:00 p.m., Mengoni was pulled over while driving the car. Police arrested him and told him that the car was stolen. He recalled telling

6

the arresting officers that he had received the Escort from defendant. An officer called Palmer's son Robert at approximately 10:00 p.m. that night to inform him that the missing Escort had been recovered.

### c. Palmer's disappearance

Palmer was last seen alive by friends and family on Saturday, April 17, 2004. She went to work that day. At some point, she spoke with Robert. They arranged to meet the next day to retrieve the impounded Escort.

Between 4:00 and 5:00 p.m. on the 17th, while in her apartment, Palmer called the friend to whom she had earlier conveyed that "if anything happened to her . . . he did it." During the call, Palmer reiterated that "she was afraid that [defendant] was going to come and hurt her and she didn't know what she should do."

At about 5:00 p.m., Palmer spoke with her daughter Tammy. They decided to have dinner together. Palmer drove to Tammy's in the Ford Ranger, arriving near 6:00 p.m. Palmer was "quiet" and not herself. She told Tammy that "she was really trying to stay away from" defendant. At some point, Palmer cried.

Palmer left for her apartment, which was about a ten-minute drive away, at around 8:00 p.m. Before departing, she and Tammy agreed that Palmer would pick up Tammy's sons the next day for an outing.

On Sunday, April 18, however, there was no word from Palmer. When Tammy called Palmer, she received no answer. When she drove to Palmer's apartment complex, she could not find the truck Palmer had been driving, even though she knew to look outside of the normal parking spot. Tammy eventually

went to Palmer's apartment unit. She knocked on the door, yelling, but again received no answer. At approximately the same time, Robert arrived at the place that he and Palmer had agreed to meet to retrieve the impounded car. Palmer did not appear. Tammy filed a missing persons report that day.

### d. Defendant's whereabouts the night Palmer disappeared

The timeline evidence least dependent on human memory suggested that defendant was at the aforementioned storage facility as late as about 6:00 p.m. on Saturday, April 17. That facility assigned a unique pin code to each customer account. A code was required to enter past the facility's gate, and to exit, if leaving in an automobile rather than on foot. A computer-generated log indicated that the pin code associated with defendant's and Palmer's account was inputted in an attempt to exit the facility at 5:01 p.m. and 6:07 p.m. on Saturday, April 17. The pin code was suspended at that time due to nonpayment, and, thus, would not operate the gate. The manager confirmed that it was possible for someone without a functional pin code to follow someone into the facility and need to wait until someone else was leaving to exit. The record does not reveal precisely when the person who inputted the pin code left the storage facility.

Defendant's acquaintance John Woodard testified that defendant appeared at Woodard's home later that night. Woodard told the police that defendant arrived around 9:30 p.m. Defendant was driving "a white Ford Ranger, late model," which Woodard, a self-described "Ford Ranger person," had never seen defendant drive before. (Recall that two days prior, Palmer's boss had loaned her the 2002 Ford Ranger at issue in count 14.) Defendant parked in a location hidden from street traffic, which

he had not done previously. Woodard understood defendant to want to trade him the toolbox on the back of the Ranger for a tile saw defendant had previously given to Woodard as collateral for a loan. Woodard refused. Within a week or so before this meeting, defendant had complained to Woodard that Palmer was mistreating him; "he was very angry at her" and "called her a cunt." Defendant did not mention her that evening, however. And Woodard did not see scratches on defendant's face that night.

The jury also heard testimony from Juan Calhoun, a witness whom the prosecution described as "probably not as accurate as some of the other[]" witnesses regarding the timeline. As the court put it (outside the presence of the jury), "[i]t seems to me that the basic facts were pretty consistent with Mr. Calhoun. The timeline was a bit confusing."

Calhoun testified that he encountered defendant the morning of either Friday, April 16, or Saturday, April 17; closer to the relevant events, he had said the 17th. Calhoun and defendant agreed to rent a motel room later that day, to "buy some drugs and get a few girls and get high in the room." Among other things, Calhoun testified that defendant left the room for several hours, returning with "a couple of scratches or some type of blood marks on his face." According to Calhoun, defendant disclosed "that he had beat the pussy up or something like that."

Calhoun understood defendant's terminology to be "like a street slang, stating that he might have had aggressive sex with his wife or whatever." Defendant had previously "mentioned something about his wife, that they weren't together." Calhoun was not certain, but thought defendant "said he broke in." At trial, Calhoun seemed not to recall telling detectives that

defendant returned at night with a bag of jewelry. He did testify, however, that he saw defendant with what appeared to be women's jewelry not long after. Mengoni also testified that, in May 2004, Calhoun told him defendant returned with jewelry and said something about "[b]eating some pussy up real bad." Despite some inconsistencies in the timeline evidence adduced at trial, nothing suggested that defendant returned to the motel room later than the early morning of Sunday, April 18.

### e. Palmer's apartment

Palmer lived in a studio apartment. At roughly 8 p.m. on April 18 — the day after Tammy last saw Palmer alive — Tammy and her husband entered the apartment with the assistance of a locksmith. Tammy (and, it seems, her husband) remained inside for no more than 10 minutes. Her brother Robert and his wife also spent a few minutes walking through the apartment that night, at some point after Tammy departed.

As relevant here, Tammy noticed several things about the condition of the apartment. The apartment smelled unusually strongly of cleaning product. A fan was on. No coffee cup or water glass appeared where Palmer usually left one. The glasses that Palmer needed for driving were on top of a table, folded; Palmer's habit was to leave them unfolded, so that she could put them on more easily with one hand when crocheting. Some of Palmer's bedding was missing. Finally, Tammy saw a pink vibrator in the area of the bathroom sink. Embarrassed, and aware her brother Robert was en route, Tammy wrapped the vibrator in toilet paper and either she or her husband hid it in an under-sink cabinet. Otherwise, Tammy testified, she "didn't touch anything."

Officers' initial, later-occurring inspection of the apartment did not lead them to believe that Palmer had been killed there. "This wasn't a typical-looking crime scene," one officer testified; "This was just a pretty clean apartment."

### f. Events preceding identification of Palmer's body

On Tuesday, April 20, defendant sold his Bronco truck (not the Ranger loaned to Palmer) to a used car dealer for $500. The dealer, who at trial recalled seeing defendant only once before the transaction, thought defendant seemed "very upset"; "basically he was saying that he wanted to kill himself." Defendant left some personal effects at the dealership. The dealer's understanding was that defendant would retrieve them, presumably the same day. Defendant never returned.

Defendant went back to Woodard's home on foot at about that time. He seemed "very upset" and told Woodard "that he [that is, defendant] was gonna be on the news." Defendant developed a habit of appearing near Woodard's home "[p]ractically every day," sometimes with a shopping cart. "[H]e was mostly trying to get money." At some point, defendant told Woodard that defendant was "going to hell and he's gonna jump off a bridge."

On Wednesday, April 21, at around 10 p.m., an officer responding to a call was directed to a motel room. Defendant answered the door. The officer observed scratches on defendant's face. He detained defendant and brought him to a police station. A few hours later, at the station, photographs were taken of scratches on defendant's face and his inner left arm. Defendant was released later that day; that is, Thursday, April 22.

Also on April 22, detectives assigned to the missing persons division went to the dealership to which defendant sold his Bronco. The vehicle was impounded that day. A criminalist visually inspected the Bronco a few days later. Among other things, he saw a shovel, towels, and the restraining order naming defendant.

The missing persons detectives caused photographs to be taken of certain items that defendant left at the used car lot, but do not appear to have secured or retained those items at that time. At some point thereafter, the dealer placed defendant's belongings in a dumpster. A homicide detective retrieved miscellaneous papers from the dumpster, including receipts and what "looked like a resume for Paul Baker and some other items with his name on it." One of the roughly 15 receipts from Home Depot was dated March 27, 2004 and reflected a purchase of an item called "multi color" with a specified item number. Although the significance of that purchase was not apparent at this point in the investigation, trial testimony of a Home Depot employee and the president and CEO of a rope manufacturer tended to indicate that the item reflected on the receipt was rope of the kind found wrapped around Palmer's body when her remains were later discovered.

Law enforcement personnel searched Palmer's apartment several times before her body was identified. Carpet under a coffee table appeared to be stained with blood. Those areas tested preliminarily positive for blood using a phenolphthalein test, as did a small drop on the wall and a spot on a piece of furniture. A criminalist with special goggles and lighting also identified areas that may have been stained with semen on the front part of a couch cushion, down the front of the couch, and on the carpet at the base of the couch. The couch and carpet also

tested preliminarily positive for semen using an acid phosphatase test. The criminalist's testing did not enable him to determine how long the semen had been there. A pink vibrator was also collected from an under-sink cabinet.

Finally, Mengoni, whom defendant had given the stolen Escort, was charged with felony joyriding, and remained in custody until about Friday, May 7. Within a week of his release, likely in the range of the 11th to 14th, Mengoni encountered defendant while on a walk. Mengoni was angry about the arrest, especially because the car appeared to be connected to a missing person. Defendant assured him not to worry about it, saying that "nobody would . . . show up to court to press charges." If this conversation took place on or before May 14, as Mengoni recalled, then it occurred before Palmer's body was identified — and tended to show that defendant had special reason to believe that Palmer, then missing, would not be found alive.

g. *Discovery and identification of Palmer's body*

Palmer's unidentified body was found on May 11 in a desert area of Riverside County. Due to substantial decomposition, much of what remained was skeleton; at an autopsy performed the next day, she weighed 22 pounds. Palmer's fingers were rehydrated, and her prints compared to DMV records. She was identified on May 18 or 19, 2004.

Palmer's remains were found largely surrounded by foam padding. Two blankets were wrapped around her and held in place with a rope, "secur[ing] the body in kind of a fetal position or balled-up." Her jeans were unzipped and pulled down to her thighs, exposing her underwear (which was fully on). A sweatshirt was atop her chest between her arms. An unclasped bra was underneath her body. There were no

apparent signs of tearing on the jeans, underwear, sweatshirt, or bra.

Various items were found near Palmer's body. They included a dental chart bearing the name Judy Palmer; a Notice of Privacy Practices bearing the name Paul Baker; and a picture with the inscription, " 'Judy, I'll always love you, no matter what. I miss you very much. Love Paul B.' " Other items found nearby are discussed as relevant below.

Given the extent of decomposition, the doctor who performed Palmer's autopsy was unable to determine the cause or time of her death. "[T]here were no internal organs of any kind available," and "[t]he genitalia, the external genitalia and internal genitalia, were absent." Although it was possible that Palmer had been asphyxiated (or stabbed, or killed by blows to the body), the bindings around her appeared to be used so that her body would be easier to move. The doctor did convey, however, that he did not think Palmer died of natural causes; "[t]he nature of the bindings and the way that the body was treated post mortem was — certainly suggests that it wasn't a natural death." The doctor also opined that the condition of her body was consistent with her having died on April 17 or early April 18; been left in the desert soon thereafter; and having remained there until May 11.

### h. Defendant's arrest and aftermath

Officers arrested defendant on May 20, 2004, at about 1:00 p.m. Items of his property recovered soon after included an acknowledgement of receipt regarding a mental health agency's notice of privacy practices. The prosecution argued that this document was identical to the notice found near Palmer's body, except that defendant had signed the version found near

Palmer. None of the items collected appeared to have blood on them.

The missing Ford Ranger loaned to Palmer received several parking citations in the days that followed defendant's May 20 arrest — the first shortly after midnight on May 21, the last on June 1. On June 2, an officer recovered the Ford Ranger and had it impounded. An LAPD criminalist searched the vehicle two days later. The Ranger did not contain the toolbox defendant attempted to trade to Woodard on the night Palmer disappeared. The criminalist did, however, find "plant material" in the bed of the truck and inside the cab on the floor near the passenger seat. The LAPD gave four samples of plant material to a botanist; two from the truck, and two from a location in Riverside near where Palmer's body was found. The botanist testified that the samples appeared to be tamarix aphylla, a distinctive, uncommon plant found in only a few regions of California, including Riverside. The samples could have come from the same plant, but the botanist was not certain they did.

Finally, Tammy went to clean out Palmer's apartment after Palmer's body was identified. The person she was with leaned against the couch, and what appeared to be a crack pipe fell out. Tammy's husband turned the pipe over to a detective.

### i. Forensic evidence

Several items collected during the investigation of this case were submitted for scientific analysis. Defendant contends that some of the results of that analysis were improperly admitted at trial, because the analysts were not available for cross-examination. (See *post*, pt. II.E.) This section describes only analysis performed by three criminalists who testified at trial.

One criminalist observed sperm cells on cuttings from Palmer's rug and couch, as well as on a swab of the vibrator. The cutting from the rug had "a lot of sperm"; "approximately 100 to 250 sperm per . . . three microliter drop." The swab of the vibrator had only two. The analyst could not determine the age of any seminal fluid on the rug, the couch, or the vibrator.

A different criminalist screened several items for seminal fluid using an acid phosphatase test. A towel in a bag found near Palmer's body screened positive, as did an aqua-colored blanket in a different bag nearby. Microscopic examination of extractions from those items revealed sperm cells. The groin area of Palmer's underwear screened negative for seminal fluid, but a later screening of other portions of the underwear was "positive, in that it changed color[,] [b]ut inconclusive, in that it was different than what I typically see." The criminalist did not evaluate the relevant areas microscopically.

The third criminalist specialized in DNA analysis. She testified that a sock found in a bag near Palmer's body matched the DNA profile the criminalist created regarding Palmer, as did various other items.

The criminalist also created a profile of defendant's DNA. Among other things, she compared that profile to sperm and nonsperm fractions extracted from the aqua-colored blanket. She found defendant's profile in both the sperm and nonsperm fractions. A cigarette butt from the same bag also matched defendant's profile, as did a sperm fraction extracted from a towel cutting.

The criminalist understood the frequency with which defendant's profile would appear in the population to be "in the magnitudes of trillions." The profile common to defendant and

the cigarette butt would be expected to appear in one in 120 trillion Caucasians. The more detailed profile common to defendant and the sperm fraction from the towel would be expected to appear in one in 740 quadrillion Caucasians.

The criminalist could not indicate when defendant's sperm was secreted on the blanket or the towel. Sperm cells could remain even after exposure to sunlight or washing in detergent, "[b]ut it's also very possible" for sperm to be removed; "[i]f you have a lot, there could be a lot left behind. If there wasn't a lot, it could be completely washed away." Each subsequent washing diminishes the likelihood of finding sperm. Additionally, "[t]he constituent of the semen is the acid phosphatase, which is water soluble and it tends to wash out." The criminalist "would not expect to get a positive result with acid phosphatase, which is the enzyme that is water soluble," if underwear had been exposed to semen and laundered.

Finally, as noteworthy here, the criminalist extracted a sperm fraction from cuttings of Palmer's underwear, though she did not observe any sperm visually. Although the criminalist could only create a partial profile from that fraction, the profile was consistent with defendant; he could "[]not be excluded." The cuttings were forwarded to another lab for a different type of DNA testing.

*j. Evidence of uncharged offenses*

In addition to the charged offenses, the prosecution also introduced evidence of uncharged offenses that defendant allegedly committed against other women. Defendant contends that the evidence of uncharged offenses was unduly prejudicial. (See Evid. Code, § 352.) That evidence is discussed as relevant

below. (See *post*, pt. II.D.) The balance of this background section describes evidence regarding other charged offenses.

### k. *Lorna T. (Count 10)*

The jury convicted defendant of one count of sodomy by force regarding Lorna T. She met defendant at an A.A. meeting in approximately the summer of 1994. They started dating about a month later, dated intermittently for about five months, and renewed their relationship sometime thereafter. During the time in which they were dating, defendant demonstrated an interest in pornographic films featuring anal sex and "whips and chains."

One evening in mid-December 1995, defendant attacked Lorna T. in her bedroom. They were lying naked on her bed shortly before she was to leave for a Christmas party when defendant said " '[g]ive me some from the back.' " After Lorna T. repeatedly refused, he pushed her from her side onto her stomach; held her down by the back of her neck (pressing her face into the bed and making it difficult for her to breathe); and forced her to have anal sex with him. Lorna testified that "[i]t hurt like he was just ripping me, like, you know, just forcible, forcing his self real hard . . . ." After defendant stopped, she said what he did was wrong and asked him why he did it. He said nothing, got dressed, and left. Lorna feared that if she called the police, "he would retaliate."

### l. *Kathleen S. (Counts 6, 7, and 16)*

Defendant was convicted of three offenses regarding Kathleen S.: forcible rape (count 6) and forcible sodomy (count 7), regarding an incident in June 1997, and forcible sodomy (count 16), regarding an incident in April or May 1997.

Kathleen met defendant in late 1996 or early 1997. She was homeless at the time and struggling with drugs and alcohol. Defendant was living in his van and offered to let her stay with him, which she did. They began an intimate relationship.

One night in April or May 1997, they were inside the van. Defendant told her that he "wanted it from behind," which she understood to mean that "he wanted to anally penetrate me." She told him that she did not want to engage in anal sex. In response, "he took it anyway." He told her that "he does this to all of his women." She did not report the incident to the police that night, "[p]robably because of the life I was living at the time and fear of going back into the streets."

At some point, Kathleen was offered a job as a dog groomer and inquired about a job for defendant. Defendant was hired. Her employer eventually discovered that defendant had a background as a handyperson. The employer offered to let defendant and Kathleen live in the employer's garage in exchange for defendant working on the employer's house on weekends. Defendant and Kathleen accepted the offer and moved into the garage on June 2, 1997.

The day they moved in, they went to a nearby bar. Kathleen invited a friend to join them. Defendant knew about the invitation but found out only after it had been extended that the friend was an ex-boyfriend of Kathleen's. After they returned to the garage, defendant became angry and assaulted her. He bit her thumb, hit her face, and threw her into the garage door. Testimony from neighbors who heard noises coming from the garage corroborated that a violent confrontation occurred.

Kathleen could not remember much of the event. But she vaguely recalled being on a mattress on her stomach and felt pain in her anal and vaginal regions. Based on her injuries, she concluded that she had been raped and sodomized.

Kathleen also recalled defendant telling her "that he was gonna take me out to the desert and tie me up and have his friends rape and kill me." She further testified that at some point "he got ahold of my wrist, I believe, and proceeded to drag me out of the garage saying that I'm gonna take you in the house and show you what I've done to you" — adding, "I knew he would kill me if he took me in that house." In response to her asking why he was doing this to her, "he said he does it to all of his women, that same remark." As he dragged her out of the garage, she broke free and started running. "I believe at that time I heard someone say it was the police."

A detective who arrived at the scene testified. He saw Kathleen running out of the garage, followed by defendant. "The right side of her face was completely swollen, her eye swollen shut, red and puffy, and she was bleeding from her mouth." "As she ran past me initially she screamed 'don't let him get me again. Don't let them take me to the desert.'" He believed "she used the term 'he fucked me in the ass.'" She was transported by ambulance to a hospital.

Kathleen recalled "a few bodies . . . trying to restrain me," and then "waking up in the hospital." Her memory of her time in the hospital is "very vague." "I remember speaking to somebody who was telling me it was okay, that the police had helped me and the doctor needed to examine me."

The doctor who examined Kathleen on the morning of June 3, 1997, testified. He explained that he did not remember

the examination, but he testified based on records prepared around that time. According to those records, she was "disheveled, tearful, [and] cooperative." "[S]he had pain in her face and jaw area," as well as injuries around those areas. "[S]he stated she was beaten up and raped by live-in boyfriend Paul Baker earlier that evening — that night. She said that he tied her up, both hands and feet, 'punched and kicked me all over,' put his penis in her mouth, vagina and rectum multiple times." An injury on her right thumb appeared to be a possible human bite mark. The doctor performed a pelvic exam. She had "a small bruise on the right labia" and "an area around her rectum that looked like it might be superficial abrasion." The doctor believed her injuries "were consistent with both physical and sexual assault" and supported her description of the attack. He did not notice any tearing or bleeding of her rectum. He could not state exactly when the punctate wound was inflicted and "couldn't say it was yesterday or today" regarding the possible abrasion near the rectum. The sperm the doctor observed could have been a few days old.

### m.  Laura M. (Counts 9 and 13)

Defendant was charged with, but acquitted of, two counts of forcible sodomy regarding Laura M. She and defendant met through a mutual acquaintance in 1996 and, intermittently, had consensual intimate relations until sometime in 2001. The first charged incident allegedly occurred at a hotel in December 2000. Laura testified that defendant tied her to a bed post and forced her to have anal sex with him. The second charged incident allegedly occurred at Laura M.'s home in January 2001. She testified that he pulled her out of the shower, threw her to the floor, and again forced her to have anal sex with him.

Cross-examination focused primarily on Laura M.'s alcohol use and gaps in her memory. The jury also heard testimony that Laura M. had been convicted of several misdemeanors, including making a false report to a public agency or peace officer.

### n. Susanne K. (Count 11)

Defendant was charged with, but acquitted of, one count of forcible rape regarding Susanne K. She and defendant met through A.A. in approximately February 2001 and went on a first date in May of that year. They ended up at her home. Susanne K. testified that, while there, defendant had sexual intercourse with her against her will, despite her repeatedly telling him she did not want to do so. Because Susanne K. passed away before trial, the jury did not have an opportunity to hear her testify; it heard a reading of her testimony from the preliminary hearing in this case.

### 2. Defense case

The defense called several witnesses relevant to the offenses concerning Laura M. As noted, the jury found defendant not guilty of those offenses.

The defense also elicited various pieces of information regarding the offenses related to Palmer. Among other things, questioning probed officers' interviews of Calhoun and whether officers had assisted Mengoni in exchange for his testimony. Various other details concerning the investigation were also elicited; for example, that Palmer's apartment door did not appear to be damaged about a week after her disappearance, and that Woodard said he never reported seeing scratches on defendant's face. Much of the testimony retraced investigators'

steps, including a conversation in which a victim of an uncharged offense did not report that offense.

## B. Penalty Phase

### 1. *Prosecution case*

The prosecution offered additional photographs documenting Kathleen S.'s injuries arising from the incident in the garage. It also offered certified records indicating that defendant had been charged with and convicted of possession of a controlled substance (cocaine base) in June 1999.

Palmer's daughter-in-law Vicki R. testified. She described Palmer as "like my mom" and a doting grandmother to Vicki's children. Vicki's daughter "totally shut down" after Palmer's death, as did Vicki's husband Robert. Vicki's two younger sons, she added, also missed their grandmother; one of them testified to similar effect, as did one of Palmer's grandsons through her daughter Tammy. When asked what she missed most about Palmer, Vicki replied, "[h]er love, her support." Palmer's son-in-law Casey G., Tammy's husband, also described Palmer as "a great mother-in-law" who "helped so much in our lives."

Palmer's son Robert described her as a "lighthearted, really easygoing" person who "wanted to help . . . and listen to everybody." Her death had changed him; "you just don't know who you can trust, you know. When you learn that somebody who acts like they're your friend and then waits until your most sensitive moment and they want to do such a thing to you . . . ." Knowing how Palmer died made it harder for him to enjoy memories of their time together.

Palmer's daughter Tammy explained that Palmer "had a clean bill of health" and had been focused on her well-being because "[s]he wanted to be around to watch her grandkids grow

up, go to college." When Tammy was a young child, she was ridiculed due to a facial birth defect. Palmer counseled her concerning how to deal with the situation and Tammy "never had any problems after that." They remained close even during Tammy's teenage years; "[W]e never had any fallouts. We never had any of that teenage bicker back and forth . . . . I never went through that. I had so much respect for her." Although Palmer had suffered through a period of "deep depression" when her then twelve-year-old son was struck by a car and killed, Palmer and Tammy's time together was largely filled with jokes and laughter. Palmer was Tammy's best friend.

Tammy also described her emotions after Palmer disappeared. "I went from frantic to anger, back to frantic" when Palmer was missing, Tammy testified, and "didn't sleep for three weeks." Learning that her mother had been murdered made her and her ten-year-old son very angry. Tammy was different now; "I don't trust anybody." "I feel about 20, 30 years older. . . . [I]t took me almost a year to stop shaking." Her memories of her mother were also tarnished. "I wish when I had those good memories that they didn't have a picture of her at the desert or how she was killed in her apartment. But it always finishes — my good memories always finish with that picture."

People who knew Palmer through A.A. also described her importance to that community. "She was an extremely well-respected human being as far as her willingness to go to almost any lengths to help anybody," one said. Another described Palmer as "the most giving, understanding, dedicated, wonderful, generous, nonjudgmental, caring person." A third recalled Palmer's sobriety even after Palmer's twelve-year-old son was killed. Approximately a day after her son's death, Palmer shared the news; " [']if you are hurting,['] [Palmer] said,

[']I'm here to tell you that there's nothing so awful in your life that you have to drink again.['] " "And I remember thinking," the witness continued, "if this woman can lose her child right in front of her, then I certainly don't ever have to have another drink. And that's kept me sober . . .[,] that knowledge that if she can stay sober through that, well then I can stay sober."

### 2. *Defense case*

The defense case had two main components. The first involved family members describing defendant's difficult childhood. The second was the expert testimony of Dr. Jay Adams, a clinical psychologist.

Defendant's older sister Penny explained that their biological father left their household when she was about five years old. They grew up with an aloof stepfather, one of the five husbands their mother had had by the time of trial. The household, which at times included Penny, defendant, two of their siblings, five step siblings, and a child born to her mother and stepfather, struggled financially. She did not recall any of the children ever visiting a dentist before she turned 18, the age at which she left home. Sometimes they did not have food, a phone, electricity, or oil for heat and warm water during cold Pennsylvania winters. The children bathed only once per week and often wore unwashed clothing.

Penny was roughly 9 or 10 years old when she became aware that her mother and stepfather had problems with alcohol. When her mother was very drunk, "she was abusive. I mean, she was a very angry drunk." She would hit the children with "anything available. A wooden spoon, a belt, a book." "Sometimes . . . she would go into a rage and wouldn't be able to stop." The stepfather would hit them, too; "[h]e was a very

muscular man" who "wouldn't hold back." Their mother and stepfather would also scream at each other and fight physically. At one point Penny called the police, afraid that the stepfather would kill her mother. The police arrived and asked the stepfather — a former police officer — whether they needed to come in. The stepfather said no. The police "just turned around and walked away."

Defendant was also exposed to sexual content at a young age. When the family was in the living room watching television, Penny explained, their stepfather "would put his arm around [their mother] and put his hand down the shirt and feel her breasts." There were pornographic books and magazines around the house, accessible to all of the children. Defendant's half brother testified that defendant's mother and stepfather would watch pornographic videos while the children were around. There was also evidence tending to suggest that defendant may have been aware of his mother's intimate activities with other men.

Defendant, Penny testified, wet his bed "to a very late age," possibly even as a teenager. Her mother and stepfather beat him in response. Sometimes their stepfather would hit the children so hard that they would fall to the ground, and then, while on the ground, hit them more. She never heard him apologize. He left the family when defendant was approximately nine years old. Defendant was largely unsupervised from then until he was about 14 years old, when his mother relinquished her custody of him at a police station. Cross-examination elicited some of his misbehavior to that point, without defense objection.

Defendant's younger sister June gave similar testimony about her mother and stepfather's conduct, including daily alcohol consumption and frequent violence. His half brother Clyde also testified similarly. June recalled defendant having seizures and sometimes sleepwalking naked with his stuffed monkey. She recalled that he was hit more than the other children. On at least two occasions, she saw the stepfather pick defendant up by the neck when defendant was seven or eight years old. She left the house for good when she was 14; "I couldn't handle it anymore." June also conveyed that defendant struggled with drugs "on and off through his entire life." Cross-examination of June addressed an incident in which defendant stole from his sister, potentially to obtain drugs. Among other things, cross-examination of Clyde elicited, without objection, that defendant threatened to kill Clyde when defendant was roughly 13 or 14 years old.

Defendant's mother testified. She had not seen him in about 15 or 20 years. She testified that defendant's biological father hit her, including while she was pregnant with defendant, and also hit defendant, even though defendant was only a few years old before the father left the family. After defendant's biological father left, he never called to speak with the children, never sent them cards, and paid child support only once. Defendant's bedwetting became worse after his father left, and worse again when his mother remarried. She and his stepfather would discipline the children physically. When defendant was about eight years old, she took him to counseling at his school's suggestion. The stepfather attended once; the counselor said "he was part of the problem," and he refused to attend again.

Defendant's mother related that she and defendant's stepfather would drink every day. With or without alcohol, he

27

would sometimes get very angry and hit her (including in front of the children) or hit the children themselves. At one point she got carried away hitting defendant and "[t]he rest of the kids and the dog" had to pull her off him. She eventually had defendant declared incorrigible and gave him up after he threatened her and her daughter. She did not visit him regularly "because it was a long drive" and she had to work.

Defendant's mother also described some of defendant's other difficulties as a child. He was diagnosed with a form of epilepsy. Even at the age of five or six, he would drink his mother and stepfather's alcohol — conduct for which he was not disciplined. He also struggled with schoolwork. Without objection, cross-examination elicited that defendant had committed theft, both as an adult (from his mother) and as a child (from others).

Dr. Adams thought it "pretty clear" that defendant "suffered from major [recurrent] depression" and "less clear, but I think pretty likely, there is a diagnosis of polysubstance dependency, which means that the person has used and become dependent upon at least three substances." Her testimony conveyed much of the information on which she relied in reaching those conclusions. She also identified indicia of potential dissociative disorder, generalized anxiety disorder, and post-traumatic stress disorder. She thought defendant "clearly" met the criteria for antisocial personality disorder, with features of borderline personality disorder.

Difficult upbringings, she explained, can prevent individuals from developing the skills necessary to cope with stress in a nondestructive way. She opined that defendant's relationship with women was characterized by hostile

dependency; he "sought out closeness with women" but "doesn't have the skills to maintain a relationship." She anticipated "that he would have problems coping with stress, that he would easily become overwhelmed and not have developed the skills to deal with stress very well." Regarding rejection, she thought "he would find rejection very damaging and very psychologically threatening," the type of threat to which he might impulsively "react very aggressively."

Although at some point another mental health professional had identified defendant as malingering, and it was "certainly possible" that there had "been instances where he malingered," Dr. Adams emphasized that just "because someone is malingering in a particular instance does not necessarily mean that they don't have other psychiatric diagnoses."

Cross-examination elicited, among other things, that Dr. Adams did not include her diagnoses in her written report, and that those diagnoses were not made available to the prosecution until the eve of her testimony. It also probed the reliability of the bases for her testimony, such as self-reported information and documents prepared by a defense mitigation specialist. The prosecution also sought to distinguish any impulse control issues defendant might suffer from the assertedly planned nature of the murder.

### 3. Rebuttal

The prosecution called one rebuttal witness, John Gaynor, a group care counselor at a facility at which defendant arrived in 1977. Gaynor had prepared a memorandum on which the defense expert relied. His testimony clarified an ambiguous passage in the document. As clarified, the thrust of the passage was that defendant could behave himself if incentivized to do so

but had "little sense of personal motivation . . . to control and manage his behavior."

## II. DISCUSSION

### A. Denial of *Batson/Wheeler* Motion

"Peremptory challenges may not be used to exclude prospective jurors based on group membership such as race or gender." (*People v. Armstrong* (2019) 6 Cal.5th 735, 765 (*Armstrong*); see *Batson v. Kentucky* (1986) 476 U.S. 79, 97; *People v. Wheeler* (1978) 22 Cal.3d 258, 276 (*Wheeler*).) "Excluding even a single prospective juror for reasons impermissible under *Batson* and *Wheeler* requires reversal." (*People v. Huggins* (2006) 38 Cal.4th 175, 227.) When a party opposing a peremptory strike makes a prima facie case that the strike was motivated by impermissible discrimination (step 1), the proponent of the strike must offer a nondiscriminatory reason for that challenge (step 2). (*Armstrong*, at p. 765.) The question then becomes (step 3) whether the opponent of the peremptory challenge has shown it " 'more likely than not that the challenge was improperly motivated.' " (*Id.,* at p. 766; see also *Purkett v. Elem* (1995) 514 U.S. 765, 767 (*Purkett*).)

The prosecution in this case peremptorily struck both prospective jurors who identified themselves as Black and had not previously been excused for hardship or cause: Prospective Jurors R.T. (No. 7731) and T.P. (No. 9049). The trial court found a prima facie case of discrimination based solely on "sheer numbers." The prosecutor explained that she struck both prospective jurors because she thought it would be difficult for them to impose the death penalty, relying in part on R.T.'s demeanor during voir dire. Defense counsel did not dispute the sincerity of the prosecutor's explanation, nor the accuracy of the

observations underlying it. The trial court found that the prosecutor was "credible" and "that her observations are based on race neutral reasons." We affirm the denial of the *Batson*/*Wheeler* motion.

### 1. Background

#### a. Prospective Juror R.T. (No. 7731)

Prospective Juror R.T. described herself in her juror questionnaire as a 51-year-old Black woman. She wrote that she "believe[d] in the death penalty" and was "moderately in favor" of it. She felt comfortable serving as a juror in a capital case, asserting that she would be able to vote for death if appropriate under the facts and the court's instructions. The death penalty was worse than life imprisonment, she added, because "[a] life is ended." Prospective Juror R.T. indicated that she did not belong to any organization that advocates for or against the death penalty. The religious organization to which she belonged, she added, does not take a position on the issue.

The People did not seek to excuse Prospective Juror R.T. for cause based on her questionnaire. During *Hovey* voir dire (see *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80), defense counsel elicited that R.T. could not indicate whether she preferred a sentence of death or life imprisonment because she "ha[dn't] heard any facts"; that she would be open to listening to mitigating and aggravating evidence; and in particular, that evidence about the defendant's life "would help" in selecting a penalty. *Hovey* voir dire continued:

"[PROSECUTION:] Okay. I want you to imagine that you've gone through the whole trial, you've gone through the penalty phase, you considered the mitigating and aggravating circumstances and based — based upon all of that you've

determined that in this particular case death was an appropriate penalty. I want you to imagine that you're sitting in the jury box and look at the defendant and tell us if you would feel comfortable or that you could announce your verdict is death? Could you do that, looking at the defendant right here and now?

"[R.T.:] *I really don't know.* [¶] *I don't know if I'd be comfortable or if I'd be scared.* [¶] *I don't know.*

"[PROSECUTION:] Okay. Because you don't know, because you have those feelings, do you think it would be difficult for you to sit on a trial of this nature and impose the death penalty if you believe it is appropriate to do so based upon everything you've heard?

"[R.T.] *That's a possibility.*

"[PROSECUTION:] Do you think it would be impossible for you to impose the death penalty because of those feelings of uncertainty?

"[R.T.:] No." (Italics added.)

The court then inquired whether R.T. was open to weighing mitigating and aggravating factors at the penalty phase to reach an appropriate verdict ("Yes," she responded); whether that verdict could be life without the possibility of parole or the death penalty ("Yes"); and whether she was open to both possible sentences ("Yes, I am"). Both parties passed for cause. The prosecution later exercised a peremptory challenge against R.T. The defense did not object at that time.

### b. *Prospective Juror T.P. (No. 9049)*

Prospective Juror T.P. described himself on his juror questionnaire as a 44-year-old Black man. He wrote that he was

"neutral" about the death penalty and thought it "might be" necessary "in some cases of extreme violence." He also conveyed, however, that he viewed life imprisonment as a worse punishment than death. When asked whether he belonged to any organization that takes a position for or against the death penalty, he answered "no." But when asked whether his religious organization had a view on the death penalty, he said "yes"; namely, that "God is the only one to give life and take life," a view with which he agreed. Prospective Juror T.P. indicated that he was comfortable serving as a juror in a capital case and would not automatically vote for or against death. But he also said that he could *not* see himself "in the appropriate case choosing the death penalty instead of life in prison without the possibility of parole."

During *Hovey* voir dire, the court and the parties probed some of these apparent inconsistencies. When the court asked why T.P. did not know whether he could impose the death penalty, T.P. replied, "I don't think — I think that belongs to a higher authority than myself. I don't think I'm — I should be one to decide a man's life." When asked "are you against the death penalty," T.P. replied, "Yes, I am." When pressed about whether he could impose the death penalty, T.P. variously indicated: "Well, it's sort of kind of a mixed feeling with it, you know"; "If somebody's found guilty beyond a reasonable doubt, I think maybe so, yeah"; and that he could impose death "[i]f it's very appropriate." When informed by the prosecution that felony murder does not require intent to kill and asked whether he would "absolutely refuse to impose [the] death penalty if you believed the defendant did not intend to kill," T.P. replied, "Right. In that case, I don't think death would be merited if it's unintentional," regardless of any aggravating circumstances.

Prospective Juror T.P. had also indicated, however, that he could follow the court's instructions and be open to imposing the death penalty.

The prosecutor challenged T.P. for cause "based upon the fact that he could not impose the death penalty . . . in this present case," citing T.P.'s unwillingness to impose death absent proof of intent to kill. The court denied the challenge: "Again, I have a problem with the juror not being familiar with all the facts of the case, not having heard the case, not being given the full instruction under the law as to what felony murder is. I don't think I can excuse him for cause based upon that limited inquiry. I just think it would be improper. So he'll be retained." The prosecution later exercised a peremptory challenge against Prospective Juror T.P.

### c. Objection and ruling

Immediately after the prosecution struck Prospective Juror T.P., the defense raised an objection "in the nature of a [state law] *Wheeler* motion," which the court understood to raise a federal *Batson* claim as well. (Cf. *People v. Williams* (2006) 40 Cal.4th 287, 310 & fn. 6 [holding, even after *Johnson v. California* (2005) 545 U.S. 162, that a *Wheeler* motion preserved a *Batson* claim on appeal].) This colloquy followed:

"[DEFENSE]: . . . [F]rom my recollection and observations, there are only two black jurors in the venire and the prosecution has moved to excuse the two and I believe that qualifies as a cognizable group and they should have to show good cause as to why they would do such a thing.

"THE COURT: I'm making the same observations. There were two blacks left in the jury, one female and one male, both [of] which have now been exercised and excused by the people,

Juror No. 9049, and Juror No. 7731 who was a female. [¶] Based upon that, there are no additional black jurors left in the venire and those are the only two exercised by the [P]eople. [¶] The court is going to find a prima facie case — well, before I do that, I would like the [P]eople to offer an explanation as to the excuse for these two jurors.

"[PROSECUTION]: We weren't in the position to pull out their questionnaires to get verbatim quotes about what they had said. The court's made a prima facie finding —

"THE COURT: Not yet.

"[PROSECUTION]: Each of the two African American jurors who were excused expressed extreme difficulty in imposing the death penalty, which is a race neutral reason for exercising a preemptory. The lady juror who was . . . the people's fourth preemptory challenge, her body language was extremely unreceptive both to the prosecution and the idea of having to impose the death penalty and she expressed verbally that she'd have a great deal of difficulty in doing it. With regard to the prospective alternate whom the [P]eople just kicked, I believe he wrote some extremely strong answers in his questionnaire in opposition to the death penalty.

"The decisional law . . . makes it clear that the inability to impose the death penalty or even equivocation with regard to comfort in imposing the death penalty are race neutral rationales for kicking a juror.

"It's probably also worth stating because there's not only [w]hat's in the *Wheeler* arena, but also a related arena under the Sixth Amendment it's worth pointing out to make a full record that the defendant is a non-Hispanic Caucasian and that same description describes all of the victims. They would be what you

would call Anglo-Saxons with the exception of one woman who may be partly African American — who is a trivial witness to the case — I believe Lorna [T.] is.  Everyone else appear to be a non-Hispanic Caucasian who is associated with this case as a witness.  [¶] I only point that out in case there's going to be some Sixth Amendment challenge also.

"And, by the way, I do apologize, your honor, if the court needs stronger basis for the reason for kicking those two jurors, I'd have to get out their questionnaires, which may take a moment or two, and it would have to happen in front of the jurors.  If that needs to occur, perhaps we can ask the jury to step outside.

"THE COURT:  The court does find a prima facie case based upon the sheer numbers of both African American or black jurors being excused; however, in listening to the explanations given by counsel, I presume they would be the same.

"[PROSECUTION]:  Yes.

"THE COURT:  They appear to be race neutral.  [¶] There are no racial issues in this case that I am aware of, which doesn't necessarily defeat a *Wheeler Batson* motion, but I find that [the prosecutor] Ms. Ford is credible, that her observations are based on race neutral reasons that are proper challenges — or proper preemptory challenges.

"[PROSECUTION]:  Your honor, once the jury has been let go, can I ask to raise this topic again and bring out their questionnaires?

"THE COURT:  Yes. . . . [¶]  . . . You can augment the record later."

The court denied the *Batson/Wheeler* motion. The court later asked the prosecutor whether she wished to augment the record. She did so, offering details regarding her pattern of strikes and the prospective jurors' reactions to questions regarding the death penalty.

### 2. *Analysis*

Because the trial court found a prima facie case of racial discrimination and the prosecutor stated a reason for the strikes at issue, the question before us is whether defendant has shown it " 'more likely than not that' " at least one of the " 'challenge[s] was improperly motivated.' " (*Armstrong, supra,* 6 Cal.5th at p. 766; see *Flowers v. Mississippi* (2019) 588 U.S. __ [139 S.Ct. 2228, 2244] (*Flowers*) [" 'motivated in substantial part by discriminatory intent' "]; *Foster v. Chatman* (2016) 578 U.S. __ [136 S.Ct. 1737, 1747] (*Foster*); *Davis v. Ayala* (2015) 576 U.S. 257, 270 [135 S.Ct. 2187, 2199] (*Ayala*); *People v. Smith* (2018) 4 Cal.5th 1134, 1147.) "The existence or nonexistence of purposeful racial discrimination is a question of fact." (*People v. Lewis* (2008) 43 Cal.4th 415, 469.)

The answer to this factual question will ordinarily depend "on the subjective genuineness of the race-neutral reasons given for the peremptory challenge." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924, italics omitted.) A justification based on a mischaracterization of the record could reveal a discriminatory motive (e.g., *Foster, supra,* 136 S.Ct. at p. 1753), but might reflect a mere error of recollection (e.g., *People v. Hardy* (2018) 5 Cal.5th 56, 79 (*Hardy*); *People v. O'Malley* (2016) 62 Cal.4th 944, 979; *People v. Williams* (2013) 56 Cal.4th 630, 661; *People v. Elliott* (2012) 53 Cal.4th 535, 565; *People v. Jones* (2011) 51 Cal.4th 346, 366; *People v. Taylor* (2009) 47 Cal.4th 850, 896;

*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1124). Likewise, a justification that is "implausible or fantastic . . . may (and probably will) be found to be pretext[ual]," yet even a "silly or superstitious" reason may be sincerely held. (*Purkett, supra,* 514 U.S. at p. 768; *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1171 (*Gutierrez*); cf. *O'Malley,* at pp. 981–982 ["prosecutor's reliance on [prospective juror's] interest in amateur magic" did not "establish that [the prosecutor] acted with discriminatory intent"].) Of course, the factual basis for, and analytical strength of, a justification may shed significant light on the genuineness of that justification — and, thus, on the ultimate question of discrimination. (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 339.) But the force of the justification is significant only to the extent that it informs analysis of the ultimate question of discriminatory motivation. (*People v. Cruz* (2008) 44 Cal.4th 636, 660.)[1]

Given this framework, a trial court's ruling on that ultimate question is ordinarily reviewed with deference. " 'In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge.' " (*People v. Jones* (1997) 15 Cal.4th 119, 162.) "A trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as

---

[1]  Theoretically, a justification might be a pretext for a nondiscriminatory reason; people may lie to advance other ends. (See, e.g., *Reeves v. Sanderson Plumbing Products, Inc.* (2000) 530 U.S. 133, 148.) But this technical exception is unlikely to matter often, if ever, and nothing suggests that it matters here.

the credibility of the prosecutor who exercised those strikes." (*Ayala, supra,* 135 S.Ct. at p. 2201; see *People v. Stevens* (2007) 41 Cal.4th 182, 198.) Thus, "[w]hen the trial court makes a sincere and reasoned effort to evaluate the [proffered] reasons, the reviewing court defers to its conclusions on appeal, and examines only whether substantial evidence supports them." (*People v. Melendez* (2016) 2 Cal.5th 1, 15.)

For the reasons discussed below, we conclude that the trial court made a sincere and reasoned effort to evaluate the genuineness of the prosecutor's stated reasons, and that substantial evidence supports its conclusion that the strikes were not discriminatory.

### a. The trial court made a sincere and reasoned effort to evaluate the prosecutor's stated justifications

A court may make a sincere and reasoned effort to evaluate a peremptory challenge even if it does not provide a lengthy and detailed explanation for its ruling. (See, e.g., *People v. Smith, supra,* 4 Cal.5th at p. 1158; *People v. Jones, supra,* 51 Cal.4th at p. 361; *People v. Mills* (2010) 48 Cal.4th 158, 175–176; *People v. Lenix* (2008) 44 Cal.4th 602, 625–626.) Under our precedent, "[w]hen the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we . . . assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear on their credibility." (*People v. Mai* (2013) 57 Cal.4th 986, 1049, fn. 26; see also *id.,* at pp. 1053–1054; *Mills,* at p. 180; see also *People v. Williams* (2013) 56 Cal.4th 630, 699–701, 704–717 (dis. opn. of Liu, J.) [critiquing that precedent].)

That assumption can be overcome. When "the proffered reasons lack[] inherent plausibility or [are] contradicted by the record," the court's failure to probe, or to explain, may eliminate the basis for deference. (*Armstrong*, *supra*, 6 Cal.5th at p. 777; see *People v. Silva* (2001) 25 Cal.4th 345, 385.) Deference may also be inappropriate when the court evinces a misunderstanding of the legal inquiry. (See, e.g., *Gutierrez*, *supra*, 2 Cal.5th at p. 1172 ["court improperly cited a justification not offered by the prosecutor"]; *People v. Fuentes* (1991) 54 Cal.3d 707, 720.)

The prosecution in this case sought to excuse both prospective jurors at issue based on their alleged reluctance to impose the death penalty. "A juror's reservations about imposing the death penalty are an acceptable race-neutral basis for exercising a peremptory." (*Armstrong*, *supra*, 6 Cal.5th at p. 770; see, e.g., *People v. Hayes* (1990) 52 Cal.3d 577, 604.)

The trial court made a sincere and reasoned effort " 'to evaluate the nondiscriminatory justifications offered.' " (*Gutierrez, supra*, 2 Cal.5th at p. 1159.) Even before finding a prima facie case, the court signaled that it was attentive to this issue. As soon as the defense made its motion, the court indicated that it was "making the same observations" regarding the pattern of strikes — volunteering the sex and juror numbers of the prospective jurors at issue. When the prosecutor stated her reasons, the court did not "den[y] the motion without comment" (*People v. Turner* (1986) 42 Cal.3d 711, 727–728); it found "that her observations are based on race neutral reasons that are proper . . . peremptory challenges." Moreover, although the court did not separately discuss each of the two prospective jurors, it did speak to a "casewide factor[] that it found relevant" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 115);

namely, that the defendant and his alleged victims were Caucasian, unlike the prospective jurors stricken. Finally, the court found that the prosecution's explanation was "credible," reflecting, at least implicitly, that it had considered whether the prosecutor's stated reasons were factually supported (see *People v. Elliott, supra,* 53 Cal.4th at p. 569; *People v. Mills, supra,* 48 Cal.4th at pp. 175–176; *People v. Lenix, supra,* 44 Cal.4th at pp. 625–626). The court was not required to do more, at least when, as here, the defense disputed neither the accuracy of the prosecutor's observations nor the sincerity of her explanation.

Moreover, the record shows that the trial court was attentive to the demeanor of prospective jurors and knowledgeable about their questionnaires during jury selection. During the parties' challenges to prospective jurors for cause based on their questionnaire responses, the trial court reviewed the responses and voiced its own thoughts about them. Once, for instance, the trial court remarked that one prospective juror's "later answers appear to equivocate indicating that she could impose L.W.O.P. or death and that she could follow the law," before refusing to excuse that prospective juror for cause. The court was also mindful of the questionnaires when conducting *Hovey* voir dire, explaining that it would allow counsel to "have time to prepare to look at those questionnaires prior to . . . *Hovey*." (Italics added.)

The court further remarked about prospective jurors' demeanors during *Hovey* voir dire. It granted the prosecution's for-cause challenges to several prospective jurors based in part on their demeanor. For example, the court noted Prospective Juror No. 8814's "body action" and "shaking of his head," and observed that Prospective Juror No. 8891 "was highly excited, gesturing wildly." The court also denied the defense's for-cause

challenge to Prospective Juror No. 1599 after viewing "his demeanor and body language" and hearing his answers. These indications in the record support an inference that the trial court had in mind the prospective jurors' demeanor and questionnaire answers when it evaluated the prosecutor's strikes of Prospective Jurors R.T. and T.P.

That said, the trial court certainly "could have done more to make a fuller record." (*People v. Miles* (2020) 9 Cal.5th 513, 540.) For example, the trial court could have explicitly brought to bear its general awareness of questionnaire answers and jurors' demeanors when specifically assessing whether the prosecutor's race-neutral reasons for striking Prospective Jurors R.T. and T.P. were credible. "Advocates and courts both have a role to play in building a record worthy of deference. Advocates should bear in mind the record created by their own questioning — where the court and opposing counsel have failed to elicit panelist responses in a certain area of interest — as well as their explanations for peremptory challenges." (*Gutierrez, supra*, 2 Cal.5th at p. 1171.) In particular, when a strike is justified based on information that will not appear on a transcript — a prospective juror's tone, visual indicia of demeanor, and the like — a court's description of what it has observed may aid the task of appellate review. (See, e.g., *Snyder v. Louisiana* (2008) 552 U.S. 472, 479.) "[A] more detailed colloquy" than occurred here may also prove useful. (*Miles*, at p. 540; see, e.g., *People v. Smith, supra*, 4 Cal.5th at p. 1158 ["The court engaged actively in the third stage analysis, questioning counsel closely on certain points."].) "Providing an adequate record may prove onerous, particularly when jury selection extends over several days and involves a significant number of potential jurors. It can be difficult to keep all the panelists and their responses

straight. Nevertheless, the obligation to avoid discrimination in jury selection is a pivotal one. It is the duty of courts and counsel to ensure the record is both accurate and adequately developed." (*Gutierrez*, at p. 1172.)

The law, however, does not require a court in all circumstances to articulate and dissect at length the proffered nondiscriminatory reasons for a strike. The record in this case reveals that the trial court made a sincere and reasoned effort to evaluate the justifications proffered, and on that basis, deference is appropriate under our precedent.

For its part, defendant's briefing does not explicitly dispute that the court made a sincere and reasoned effort when evaluating the *Batson/Wheeler* motion. The briefing focuses instead on whether substantial evidence supports the motion's denial. At least one of defendant's arguments, however, is properly understood as bearing on this issue. Specifically, he argues that the court erred by relying on its understanding that "[t]here are no racial issues in this case." That reasoning, defendant continues, "is not race-neutral."

Viewing the court's comment in isolation, we understand the basis for defendant's concern about the trial court's "no racial issues" framing. *Batson* and *Wheeler* "are intended to limit reliance on stereotypes about certain groups in exercising peremptory challenges." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1016.) And stereotypes may infect a lawyer's assessment of a prospective juror regardless of the race of others involved in the trial. (See *Powers v. Ohio* (1991) 499 U.S. 400, 416 ["race prejudice stems from various causes and may manifest itself in different forms"]; see, e.g., *U.S. v. Lee* (8th Cir. 2013) 715 F.3d 215, 221 [discussing "stereotype that 'African-

American jurors are less likely to impose death and are more distrustful of the Government than white jurors' "]; *U.S. v. Kehoe* (8th Cir. 2013) 712 F.3d 1251, 1252 [similar]; cf. *People v. Williams*, *supra*, 56 Cal.4th at p. 652 [trial court: " 'in my other death penalty cases I have found that the Black women are very reluctant to impose the death penalty' "].)

Viewing the court's comment in context, however, no error appears. No doubt, a litigant may raise a *Batson/Wheeler* objection regardless of the race of the defendant or the victim. (See, e.g., *Flowers*, *supra*, 139 S.Ct. at p. 2243; *People v. Mills*, *supra*, 48 Cal.4th at p. 173.) But the trial court evinced no confusion on this point, observing that the lack of so-called "racial issues . . . doesn't necessarily defeat a *Wheeler Batson* motion." Nor did the trial court conclude that a lack of "racial issues" was a race-neutral justification for the prosecutor's strikes. Instead, it appears the court relied on that circumstance as a factor relevant to assessing whether the prosecutor's stated race-neutral reasons were genuine — that is, whether the prosecutor's strikes were in fact motivated by concerns about the prospective jurors' views on the death penalty. This was not error. (See *People v. Bell* (2007) 40 Cal.4th 582, 600 ["that defendant was not a member of any of the actual or assumed cognizable groups involved . . . [is] a factor that, because it is absent, fails in this case to support an inference of discrimination"]; see also, e.g., *People v. Rhoades* (2019) 8 Cal.5th 393, 430; *Hardy*, *supra*, 5 Cal.5th at p. 78; *People v. O'Malley*, *supra*, 62 Cal.4th at pp. 980–981; *People v. Bonilla* (2007) 41 Cal.4th 313, 343–345; *People v. Farnam* (2002) 28 Cal.4th 107, 135–137; *People v. Catlin* (2001) 26 Cal.4th 81, 119; *People v. Howard* (1992) 1 Cal.4th 1132, 1156; *Wheeler*, *supra*, 22 Cal.3d at p. 281.) Accordingly, the trial court's

statement is consistent with our conclusion that the trial court made a reasoned evaluation of the justifications offered.

We turn next to the question whether substantial evidence supports the court's conclusion that neither strike was motivated by discrimination.

### b. *Substantial evidence supports the trial court's conclusion that the strike of Prospective Juror R.T. was not discriminatory*

The prosecutor justified her strike of R.T. (No. 7731) based on R.T.'s perceived reluctance to impose the death penalty. The court's finding that the prosecutor was not motivated by impermissible discrimination is supported by substantial evidence. Although many of R.T.'s answers conveyed that she would be able to impose the death penalty, when asked whether she could announce a death verdict, "looking at the defendant right here and now," R.T. replied, "I really don't know. [¶] I don't know if I'd be comfortable or if I'd be scared. [¶] I don't know." The prosecution also described R.T.'s "body language" as "extremely unreceptive both to the prosecution and the idea of having to impose the death penalty." Although the record does not depict R.T.'s body language, and although demeanor-based justifications may in some cases provide a convenient pretext for discrimination, here, the prosecution's description was uncontroverted. The trial court was in a position to observe not only R.T.'s demeanor, but also the demeanor of the prosecutor herself, whom the court found credible. (Cf. *People v. Williams*, *supra*, 56 Cal.4th at p. 658 ["we do not discount the trial court's ability to assess the credibility of the prosecutor, even absent the trial court's personal recollection of R.P.'s demeanor"].)

Defendant, now for the first time, complains that the prosecutor overstated R.T.'s opposition to the death penalty, arguing that R.T. did not, as the prosecutor claimed, "express[] extreme difficulty in imposing that death penalty." We acknowledge that this is a somewhat strong characterization of R.T.'s answers, viewed on a cold record. But in context, this statement appears to be based on a combination of R.T.'s words and the description of her demeanor. And those words did not so uniformly indicate comfort with imposing the death penalty that the prosecutor's statement was especially suspicious. (Cf. *People v. Vines* (2011) 51 Cal.4th 830, 850 [evaluating whether prospective juror's answer was "reasonably susceptible of the interpretation the prosecutor placed on it"].) In any event, any somewhat strong characterization of R.T.'s answers, during argument over the *Batson/Wheeler* motion, does not reveal that the stated reason for the strike was pretextual.[2]

---

[2] Defendant also argues that the strikes cannot be upheld based on the record the prosecutor made after the motion was denied. As noted, after the court found that the prosecutor was "credible" and that her "observations [were] based on race-neutral reasons that are proper . . . peremptory challenges," the prosecutor asked for permission to "raise this topic again and bring out their questionnaires" "once the jury has been let go." The court later asked the prosecutor whether she wished to augment the record. The prosecutor used that record-making opportunity to describe the pattern of her strikes and to explain some of the factual basis underlying her stated concern about the prospective jurors' views toward the death penalty — not to manufacture a new, unrelated reason that "reeks of afterthought." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 246.) For example, the prosecutor explained, "the People exercised our peremptories in this way: A white female; a white female; an Hispanic female; a [B]lack female; a white female; we passed

Defendant also complains that R.T. "was never questioned regarding her 'body language.' " We note the record contains no prohibition preventing defense counsel from stating on the record or otherwise preserving his observations of R.T.'s demeanor. It is enough that R.T. was questioned in the presence of the court and the parties, whom we have no reason to doubt could observe her demeanor. (*People v. Jones, supra*, (2011) 51 Cal.4th at p. 367.)

Defendant further contends that "the prosecutor asked [R.T.] only four questions," a count apparently limited to *Hovey* voir dire. It is true that "[u]nder certain circumstances perfunctory voir dire can be indicative of hidden bias" (*People v. Edwards* (2013) 57 Cal.4th 658, 698), particularly when there is a dearth of questioning "on a subject a party asserts it is concerned about" (*People v. Huggins, supra*, 38 Cal.4th at p. 234; see also, e.g., *Gutierrez, supra*, 2 Cal.5th at pp. 1169–1170). But this consideration is "not particularly probative" in this case. (*Hardy, supra*, 5 Cal.5th at p. 83.) In addition to her own questioning, the prosecutor "heard questioning during voir dire by the court and defense counsel." (*Ibid.*; see *People v. Melendez*,

_____

twice; white female; Hispanic female; passed; white female; Hispanic male; we accepted the panel. [¶] With regard to alternates, it was Hispanic male; African American male; Hispanic male; white male; white male; Hispanic male. I don't know that the record would otherwise have any references to that." It suffices to say that the denial of the motion can be upheld based solely on the explanation initially given by the prosecutor, and that none of the statements made during the prosecutor's record-making opportunity calls that conclusion into question, including the prosecutor's slightly inaccurate claim that R.T. "said she *would* be very uncomfortable and scared to impose the death penalty." (Italics added.)

*supra*, 2 Cal.5th at p. 19.) That questioning gave the prosecutor an opportunity to observe the demeanor on which the strike was partially based. (*People v. Dement* (2011) 53 Cal.4th 1, 20; *People v. Clark* (2011) 52 Cal.4th 856, 906–907.) Finally, even assuming the prosecutor asked R.T. few questions relative to other prospective jurors (which defendant has not established), the prosecutor focused her inquiry on precisely the reason she gave for the peremptory strike: R.T.'s willingness to impose the death penalty.

Defendant asks us to engage in comparative juror analysis for the first time on appeal. We will do so, but " 'need not consider responses by stricken panelists or seated jurors other than those identified by the defendant.' " (*People v. Smith*, *supra*, 4 Cal.5th at p. 1148; see *People v. Winbush* (2017) 2 Cal.5th 402, 442–443.) We also remain " 'mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable' " (*People v. O'Malley*, *supra*, 62 Cal.4th at p. 976), and consider the probative force of such a comparison "in view of the deference accorded the trial court's ultimate finding of no discriminatory intent" (*People v. Lenix*, *supra*, 44 Cal.4th at p. 624).

With respect to Prospective Juror R.T., defendant's comparative juror analysis is not persuasive. Defendant briefly compares R.T.'s answers on her questionnaire to the answers of other jurors. But the prosecutor claimed to strike R.T. based on her answers and demeanor during voir dire. Moreover, none of the questionnaire answers that defendant identifies is similarly equivocal to R.T.'s voir dire statement that she "really [didn't] know" if she would "be comfortable or if [she'd] be scared" to announce a death verdict. And when asked similar questions

during voir dire about their ability to impose a death verdict, the other prospective jurors defendant identifies (Nos. 1267, 1599, 1999, 3466, and 6889) indicated that they could do so. This bolsters rather than undermines our conclusion that substantial evidence supports the trial court's finding that the strike of R.T. was not motivated by impermissible discrimination.

We do not suggest, of course, that any conceivable degree of hesitation about imposing the death penalty is dispositive of a *Batson/Wheeler* claim. The less substantial a prospective juror's reluctance to impose the death penalty, the more reason there may be to believe that a proffered justification based on that reluctance is pretextual. But the ultimate question is whether a strike was motivated by impermissible discrimination. And on this record, substantial evidence supports the trial court's conclusion that the strike of R.T. was not so motivated.

### c. Substantial evidence supports the trial court's conclusion that the strike of Prospective Juror T.P. was not discriminatory

The prosecutor also stated that she struck T.P. based on his reluctance to impose the death penalty, noting a "belie[f]" that "he wrote some extremely strong answers in his questionnaire." Here, too, the trial court's finding of no discrimination is supported by substantial evidence. Although T.P.'s questionnaire answers were not consistently opposed to the death penalty, and although the trial court declined to excuse him for cause, his questionnaire provided the prosecutor with reason to doubt T.P.'s willingness to impose the death penalty. He admitted his view that "God is the only one to give life and take life." And he said that he could *not* see himself "in the appropriate case choosing the death penalty instead of life

in prison without the possibility of parole." These questionnaire answers support the court's finding that the prosecutor's stated reason was not a pretext for discrimination. (See, e.g., *People v. Winbush, supra,* 2 Cal.5th at p. 436; *People v. Blacksher* (2011) 52 Cal.4th 769, 802.)[3]

Defendant argues that because the prosecutor said she *believed* T.P. wrote strong answers in his questionnaire, but did not "know[] what those answers were, the prosecutor . . . could not properly rely on those unknown answers." We disagree. Immediately after defendant objected, the prosecutor conveyed her recollection that T.P. had written strong statements in his questionnaire. In the colloquy that followed, the prosecutor offered to augment her explanations with the questionnaires. Ultimately the court agreed to the augmentation after it denied the motion. The prosecutor's recollection was supported by the record. The prosecutor was not required to have T.P.'s precise answers at the ready, and the fact that she did not casts little doubt on the basis for the trial court's finding.

---

[3] Those answers also provide a basis for the prosecution's somewhat strong statement that T.P. "express[ed] extreme difficulty in imposing the death penalty." We further note that, during voir dire, T.P. conveyed that he did not know whether he could impose the death penalty because he thought "that belongs to a higher authority than myself. I don't think I'm — I should be one to decide a man's life." And when informed by the prosecution that felony murder does not require intent to kill and asked whether he would "absolutely refuse to impose [the] death penalty if you believed the defendant did not intend to kill," T.P. replied, "Right. In that case, I don't think death would be merited if it's unintentional," regardless of any aggravating circumstances.

Defendant further contends that the prosecutor did not ask T.P. many questions. This contention also lacks force. The court and defense counsel combined to ask T.P. more than a dozen questions about his ability to impose the death penalty during *Hovey* voir dire. Even after hearing those questions (and answers), the prosecutor asked five more. She also had the benefit of the "lengthy and detailed questionnaire" she cited to explain the strike. (*Hardy*, *supra*, 5 Cal.5th at p. 83.) As the trial court put it when announcing its intention to give each side only a few minutes to question jurors individually during *Hovey* voir dire, "[y]ou are going to have a pretty lengthy questionnaire, so you won't need to do a lot of oral questioning." Under these circumstances, the lack of further questioning is not illuminating.

Finally, defendant asks us to compare T.P.'s questionnaire answers to the answers of several other jurors. "Although jurors need not be completely identical for a comparison to be probative" (*People v. Winbush*, *supra*, 2 Cal.5th at p. 443), the prospective jurors defendant identifies are too different for his comparison to be persuasive. None of the jurors he identified espoused a view similar to T.P.'s position that "God is the only one to give life and take life," and none conveyed an inability to choose the death penalty in an appropriate case. It is true, as defendant claims, that Prospective Juror No. 1599 stated that his religious organization "do[es] not believe in the death penalty." But immediately below that answer, No. 1599 indicated that he did not share the organization's belief. Defendant's comparative juror analysis thus does not undermine our conclusion that the trial court's finding of no discrimination was supported by substantial evidence.

51

## B. Excusing Jurors Based on Their Views about the Death Penalty

A prospective juror may not be excused for cause based on that person's views about the death penalty unless those views would at least substantially impair the person's ability to perform a juror's duties. (*People v. Erskine* (2019) 7 Cal.5th 279, 297; see *Wainwright v. Witt* (1985) 469 U.S. 412, 424; *Witherspoon v. Illinois* (1968) 391 U.S. 510.) A trial court's decision to excuse a juror based solely on written questionnaire answers is reviewable de novo. (*People v. Zaragoza* (2016) 1 Cal.5th 21, 37.) When a prospective juror is excused following voir dire, however, whether that juror "is substantially impaired is an issue for the trial court's determination." (*Armstrong*, *supra*, 6 Cal.5th at p. 751.) We defer to the trial court's decision so long as the trial court applied the correct legal standard and reached a decision supported by substantial evidence. (See *ibid.*; see also *Erskine*, at pp. 299–300; *People v. Spencer* (2018) 5 Cal.5th 642, 659.)

Defendant argues that the trial court erroneously excused two jurors based on their perceived inability to impose the death penalty: Prospective Jurors U.A. (No. 8814) and J.W. (No. 8891). The thrust of his claim is that the trial court's decisions were not supported by substantial evidence.

A review of the prospective jurors' questionnaires and answers during *Hovey* voir dire reveals that the claim lacks merit. U.A.'s questionnaire generally professed an openness to imposing the death penalty. But when asked about the subject during voir dire, he replied, "I think I put on my questionnaire that I could, but this is the first time I'm in a jury and now I have second thoughts. I'm not sure." And although his answers during voir dire were somewhat equivocal, he made several

statements evincing reluctance to impose the death penalty, including "[m]y definite response this time is going to be no, I won't vote for the death penalty." Similarly, when asked, "[c]ould you in fact vote to execute this man *if legally you felt it was an appropriate penalty*? Could you actually do that?," U.A. replied, "I don't know. I just don't know." (Italics added.) These statements provide substantial evidence supporting the trial court's decision to excuse U.A., which the court made "[a]fter observing [U.A.'s] demeanor, his body action, his shaking of his head."

Prospective Juror J.W. wrote on his questionnaire that he "ha[s] problems with the death penalty." When asked how he might resolve a conflict between his beliefs and the court's instructions, he wrote, "I don't know. I will have a hard time sentencing someone to death even if it means countering the judge." At least a dozen of his other answers evinced similar concern about his ability to vote for death. He later volunteered, before voir dire, that he had "problems with the death penalty" "over and above what I've put in the questionnaire," adding, "[y]ou may want to question me about that." During voir dire, J.W. claimed he could be persuaded to impose the death penalty but could not imagine a specific circumstance in which he would vote for that penalty. (Cf. *People v. Beck & Cruz* (2019) 8 Cal.5th 548, 607 [no error in excusing a prospective juror even though she "offered examples of when she believed the death penalty was appropriate"].) When asked whether he would feel comfortable serving as a juror, he indicated that he was "going to have a hard time with my own feelings of guilt if I start to tend towards the guilty aspect." He did, to be sure, convey that he would follow the court's instructions and consider imposing a death sentence. But the court concluded "he could not be a fair

and impartial juror in this case," because "his views would substantially prevent his abilities to follow the law and his oath." Substantial evidence supported this conclusion, which was again based in part on the prospective juror's "demeanor, his affect." Thus, the excusal for cause of J.W., like U.A., was not error.[4]

## C. Unbalanced Treatment of Prospective Jurors

Defendant contends that "the trial court questioned prospective jurors differently and exercised its discretion in ruling on cause challenges differently depending on the prospective jurors' view of the death penalty." He disclaims any argument "that the trial court erroneously denied his challenges for cause."

The complaint about the trial court's questioning was forfeited by a failure to object. (*People v. Pearson* (2013)

---

[4] The trial court also remarked that it was "abundantly clear that" J.W. "is anti death penalty." An individual's general opposition to the death penalty is, of course, not an appropriate basis on which to excuse a prospective juror. (See *People v. Peterson* (2020) 10 Cal.5th 409, 427 ["Long-standing United States Supreme Court precedent makes clear that prospective jurors may not be disqualified from service in a capital case solely because of their general objections to the death penalty"]; *People v. Avila* (2006) 38 Cal.4th 491, 529 ["Those who firmly oppose the death penalty may nevertheless serve as jurors in a capital case as long as they state clearly that they are willing to temporarily set aside their own beliefs and follow the law"].) But the trial court did not excuse J.W. based on general opposition to the death penalty; as noted, the court concluded that J.W.'s views "would substantially prevent his abilities to follow the law and his oath," precluding J.W. from being "a fair and impartial juror in this case." It is the finding of substantial impairment that supports the excusal.

56 Cal.4th 393, 417.) Defendant contends trial counsel did object, relying on a comment made during the discussion of whether Prospective Juror U.A. should be excused for cause. Counsel inquired whether he could "make one comment for the record." When permitted to do so, counsel complained that "by allowing this juror to be excused for cause, what is happening is we are selecting jurors that are only predisposed for death without being given the opportunity to hear all of the evidence." This appears to be an objection to the excusal of a particular juror, not a complaint about the evenhandedness of the court's questioning. Regardless, the claim does not warrant reversal. (See *People v. Champion* (1995) 9 Cal.4th 879, 909 [no reversal when defense permitted to participate in voir dire of prospective jurors and "defendants do not contend that the court erroneously refused to excuse any such jurors for cause"]; see also *People v. Whalen* (2013) 56 Cal.4th 1, 31; see also *id.*, at p. 100 (conc. opn. of Liu, J.).)

Defendant has also forfeited his complaint that the trial court "exercised its discretion in ruling on cause challenges differently depending on the prospective jurors' view of the death penalty." This claim is not that the court erroneously granted the prosecution's challenges for cause. Nor is it that the court erroneously denied the defense's challenges for cause. Instead, the argument is that even if the court reached results that were otherwise within its discretion, it did so in an unfair manner. At bottom, then, this is a claim of bias. (Cf. *People v. Mills, supra,* 48 Cal.4th at p. 189 ["judicial misconduct"].) Although defendant objected to the content of some of the court's rulings, he has not identified any instance in which trial counsel raised a bias objection. Indeed, a court may be wrong, even repeatedly, without revealing any partiality. (Cf. *People v.*

*Guerra* (2006) 37 Cal.4th 1067, 1112 ["a trial court's numerous rulings against a party — even when erroneous — do not establish a charge of judicial bias, especially when they are subject to review"].) Accordingly, this aspect of the claim is also forfeited. (See *Armstrong*, *supra*, 6 Cal.5th at p. 540; cf. *People v. Johnson* (2018) 6 Cal.5th 541, 592 [declining to reach bias claim when, among other things, defense neither objected on that ground nor "move[d] to disqualify the court on the ground of bias"]; *People v. Buenrostro* (2018) 6 Cal.5th 367, 405 ["Defendant forfeited the claim of bias by failing to raise it during the competency trial"].)[5]

### D. Admissibility of Evidence of Uncharged Misconduct

Defendant contends the trial court erred by admitting "an unwarranted amount" of evidence that he had committed uncharged offenses. The core of the argument is that this evidence was so prejudicial that it caused the jury to wrongly convict defendant of raping Palmer — though not quite so prejudicial that it prevented the jury from acquitting him of forcible rape (count 11), sodomy by force (counts 9 and 13), or sexual penetration by foreign object (count 15). (See Evid. Code, § 352 (section 352).) There was no error.

#### 1. Legal background

"[E]vidence of a person's character" is generally inadmissible "when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) That general

---

[5] Because defendant has not preserved his claim that the court was biased, we also do not address whether any such bias makes it inappropriate to deferentially review the court's excusal of Prospective Jurors J.W. and U.A.

rule does not "prohibit[] the admission of evidence that a person committed a crime . . . or other act" to prove something other than a person's "disposition to commit such an act." (*Id.*, § 1101, subd. (b).) For example, other-acts evidence may be admissible to prove motive, intent, or that "a defendant in a prosecution for an unlawful sexual act . . . did not reasonably and in good faith believe that the victim consented." (*Ibid.*) The general rule against admission of "so-called 'propensity' or 'disposition' evidence" is also subject to exceptions. (*People v. Daveggio & Michaud* (2018) 4 Cal.5th 790, 822 (*Daveggio*).) Evidence Code section 1108 provides an exception to the general rule and permits evidence that a defendant accused of a sexual offense has committed another sexual offense, potentially showing a propensity to do so. (See *id.*, § 1108, subd. (a).) The exception set out in Evidence Code section 1109 applies to certain evidence that a defendant accused of an offense involving domestic violence has committed other domestic violence. (See *id.*, § 1109, subd. (a)(1).) Both sections apply only if the evidence "is not inadmissible pursuant to Section 352." (*Id.*, §§ 1108, subd. (a), 1109, subd. (a)(1)).)

Section 352 is the focus of defendant's argument here. As relevant, that section provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." " ' " ' "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. . . . The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally

flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors." ' ' " ' " ' " (*Daveggio*, *supra*, 4 Cal.5th at p. 824.) In the context of Evidence Code sections 1108 and 1109, a defendant's propensity to commit sexual offenses or domestic violence is not an extraneous factor; it is relevant to the guilt of the accused — and evidence tending to show that propensity has probative value.

Aside from claiming an abuse of discretion under section 352, defendant does not argue that the evidence at issue in this section was inadmissible under Evidence Code sections 1101, 1108, or 1109. He does contend, however, that the admission of propensity evidence under sections 1108 or 1109 is unconstitutional.

### 2. *Constitutionality of admitting propensity evidence*

We held in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*) that "the trial court's discretion to exclude propensity evidence under section 352 save[d] [Evidence Code] section 1108 from" a "due process challenge." (*Id.*, at p. 917.) Defendant concedes as much, but asks us to "revisit the issue," observing that he must raise his objection now to preserve the issue for federal review. We see no persuasive reason to revisit *Falsetta* and reject his claim on the merits.[6]

---

[6] *Falsetta* concerned Evidence Code section 1108. Defendant has preserved his argument that the admission of propensity evidence under section 1108 denied him due process, as well as his argument that the admission of propensity evidence under Evidence Code section 1109 denied him due process. Defendant makes no serious effort to argue, however,

The remaining issue is whether the trial court abused its discretion by declining to exclude evidence under section 352.

### 3. *Claim of undue prejudice*

Although defendant's briefing catalogs the evidence admitted at trial, he does not appear to argue that any single piece of evidence was inadmissible. Instead, his claim is that the trial court admitted too much evidence in total, some of which he deems especially prejudicial. We will describe the evidence individually and then analyze it collectively.

### a. *Michelle W.*

Defendant and Michelle W. met telephonically in 1982, when she was 17 years old and he was about 20. (She dialed a wrong number, he answered, and after talking several times they eventually decided to meet.) They moved in together when she was around 18 years old. The relationship became rocky; "there were many anger issues" and problems related to defendant's drinking. At some point in 1983, defendant falsely accused her of "fooling around on him." His voice was raised "and he was angry." He threw a vase, which hit and cut her arm, "and he ripped up a couple of things in the house and then he grabbed me by the throat and started to choke me" with both hands. He also spit in her face and called her stupid and ugly.

---

that the admission of propensity evidence under section 1109 is unconstitutional even if we decline to overrule *Falsetta*'s analysis regarding section 1108. We do not reach that additional issue. We do note, however, that the Court of Appeal has rejected the view that section 1109 is distinguishable from section 1108 for due process purposes. (See *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024; *People v. Johnson* (2000) 77 Cal.App.4th 410, 412.)

Michelle moved out. She was approximately 19 years old at the time, in 1983 or 1984, and moved in with her grandmother for a month or two. At some point in 1984, Michelle and defendant had an argument. Defendant wanted to reconcile. Michelle had decided to move to Wisconsin, where her parents had moved the year prior, and "had a rental van parked in front of [her] grandmother's house." "[D]uring the time that we were moving things in and out of the van, [defendant] was across the street and he had been stalking, watching." At some point he approached her. He was "visibly upset" and confronted her with a raised voice. At some point, he hit her in the face with his fist, striking her nose and eye. She fell and hit her shoulder on a concrete wall, sustaining a scar. Defendant left; he did not assist her. No one saw the incident, but the scar remained by the time of trial. Michelle did not call the police; she explained that, still then only 19, she was "[s]cared," "ashamed," "humiliated."

Defendant and Michelle encountered each other again (still in 1984, during the moving process) at a hamburger stand. Defendant cornered her in the parking lot by her car, saying something to the effect of " '[w]here do you think you're going? You can't leave me.' " He kept her there for "20 minutes to half an hour, and it was just a standstill with no conversation." When she "finally decided to make a move to [her] car to get out of there . . . he kicked [her]" in the upper thigh. He left after that; she returned to her grandmother's house. She did not call the police, in part because she was scared. She moved to Wisconsin as planned.

Due to the temporal remoteness of these incidents, the probative value of this evidence was perhaps the least significant of all the uncharged evidence admitted at trial. As

discussed below, however, the trial court understood this evidence to corroborate a pattern of how defendant treated the women with whom he was intimately involved, and particularly those women who attempted to break off their relationships with him. (Cf. *People v. McCurdy* (2014) 59 Cal.4th 1063, 1099 [no abuse of discretion in admitting evidence of conduct "around 30 years" before charged offense where it appeared defendant's "sexual interest in young girls persisted despite the long passage of time"].) And the danger of *undue* prejudice associated with these incidents was relatively small.

At some point while in Wisconsin, Michelle called defendant. She testified that she missed him and "was still in love with him." She moved back to California at some point in 1985. After she spent a few months at her grandmother's, she and defendant moved into an apartment together. They married in 1986 and moved to Long Beach.

There were some good times during the relationship. When Michelle and defendant argued, however, he would sometimes get violent. He choked her with both hands at least three or four times. He punched her in the face occasionally; she estimated that occurred about once per year. He struggled with drugs and alcohol throughout. The violence correlated with his drinking.

Defendant and Michelle eventually had a son in 1988. Soon after, in 1989, they moved to Wisconsin, to a town near her parents. In August of 1989, Michelle and defendant went to a tavern. The tavern was empty other than the two of them and the bartender. All three were shooting pool. At some point the bartender bumped into her and her bra became unhooked accidentally. Defendant noticed that her bra had become

undone and became "extremely angry," asking whether she was having an affair with the bartender. They went home not long after, stopping on the way so that Michelle, who was drunk, could throw up. When they arrived, Michelle went upstairs to the bedroom.

Defendant followed her. He had vaginal intercourse with her, against her will, before turning her onto her face on the bed. She tried to move away from him. (She was five feet, three inches tall, and weighed approximately 90 pounds; he was six feet tall and weighed approximately 190 pounds.) At some point she fell onto the floor; when she did, he grabbed her hair and banged her head on the floor at least five times. He then threw her on the bed and sodomized her more than once. After he stopped, he bit her on the leg, back, and arm.

She escaped. She ran to a neighbor's house, and at some point, the police were called. She told an officer what happened, including that defendant said he would kill her if she left the house. Michelle went to a hospital as a result of the attack. She had "several bite marks," a "really bad headache," "and some rips" in her "rectum area." This and photographic evidence tended to corroborate that the attack had occurred.

A criminal case was filed; defendant was arrested; and a restraining order was entered that prevented him from coming to her home. Michelle was scared, however, that if she did not let him back in, "he would torment me more, he would show up at my mom's house, or he'd hurt my mom or my other family and take our son away." At some point she informed a prosecutor that she did not want to pursue the case, and it was dismissed.

Michelle, defendant, and their son moved to Florida in 1990 to obtain employment for defendant. They had a daughter

while there.  Defendant struggled with alcohol and illegal drugs and spent at least part of 1991 in a rehabilitation center.  One day, a neighbor called to let her know that defendant was nearby, "wondering why he wasn't in the treatment center."  She spoke with defendant through the neighbor's phone.  Defendant informed her that he left rehab because "[h]e was aware of a relationship [she] was having with [a] radio station D.J.," which, in fact, she was not having.  He became angry.  After this incident, she finally decided to leave him.  She left with her two children and moved in with family in California in April 1991.  She and defendant divorced in 1993.

Michelle and the children had their own apartment by 1994.  Within a few months of the Northridge earthquake that January, she heard from defendant.  He asked to move in with her and the kids in approximately June of that year.  She was "scared to say no," but also "thought . . . it would be a good idea to have the kid's father in their lives."  She told defendant that "it was not to be a permanent move into the house.  It was temporary just so he could have a mailing address for his mail and get on his feet."  He moved in that June; she made clear she was dating someone and did not want to have a romantic relationship with defendant.

"The first week or so went well.  After that, everything fell apart."  An incident occurred at Michelle's home on June 12, 1994, with the children present.  Defendant was angry.  "He thought I was pursuing a relationship with him or leading him on.  Basically, that we were together[,] and I was still dating somebody else."  "[J]ealous and enraged," he cornered her and threatened to burn her eye with a lit cigarette.  Defendant did not ultimately do so; he left.  She called her boyfriend, scared that defendant would return.  The boyfriend came over.  When

defendant returned, he and the boyfriend saw each other and began fighting at defendant's instigation. Defendant grabbed the boyfriend, "picked him up in the air and threw him." He also took out a knife and cut the boyfriend's ear. "The children were just around the corner watching what was going on."

The police eventually arrived, but by then, defendant had departed. Michelle reported what happened and later obtained a restraining order, which tended to corroborate that this incident occurred. Although there were no additional violent incidents in person, defendant would later call her for money, which she would give him because she "didn't want any trouble." Defendant began to leave her alone around the time he started dating other women.

### b. Sandra B.

Sandra B. and defendant met in July 1994 at an A.A. meeting. They became friends and eventually started dating. Within a few months of dating, defendant moved into Sandra's apartment — uninvited, and over her objection. She eventually relented, in part; "It was never no, okay, you can live here. It was like you find a place as soon as you can, you need to get out of here."

Defendant was in the process of moving out on about July 24, 1995. They argued. Defendant pulled a telephone cord out of the wall and told her "what a . . . worthless person I was . . . and, you know, I was going to pay for this and I was going to regret it. And it was really quite a terrorizing situation." She found some cards and letters she had given him torn up and shoved into her toilet.

Roughly a week later, defendant called her, "expressing that he was like depressed or upset about what had happened

between us and he asked me if I would give him a ride to an A.A. meeting. And I told him that I had somewhere to go and that after I'd done that I would come and get him." He was "irritated because I wouldn't drop everything and go get him." When she picked him up and he got in the car, he asked where she had gone. She told him that she had given a ride to a friend whose car needed repair, "[a]nd at that point Mr. Baker got really irritated because it was an ex-boyfriend of mine. And he opened the car door and jumped out into traffic . . . ." Sandra, "really upset," pulled over and looked for him, but could not find him.

Sandra picked up the friend and drove him to the repair shop where his car was waiting. As the friend started to walk toward the mechanics, "Mr. Baker was standing about 50 to 100 feet away and he started yelling at me and my friend." "And he was really angry and he threatened my friend and kind of was going between threatening my friend and demeaning me and telling my friend that . . . he had better watch out because he wasn't gonna tolerate him taking me away from him and that I was Mr. Baker's girlfriend and not his anymore and he didn't like this. And then he even came up at one point and started pounding on the hood of my vehicle," causing damage. The ex-boyfriend, who was a deputy sheriff, eventually deescalated the situation.

Sandra broke off her relationship with defendant completely after the incident, if not before, and attempted to get law enforcement involved. At their suggestion, she sought a restraining order in August or September of 1995. Around that time, defendant "would just show up like at my home, in my laundry room, at my apartment building and places that to the best of my knowledge he would have no way to know I was going to be there, but he would just be there." He would also call her

65

"incessantly. Sometimes he would call me 15 times an hour, just keep calling and calling and calling. . . . He would leave threatening messages and they would be escalating in anger and aggressiveness and threats." Defendant wanted to get back together; Sandra refused. He did not take the refusal well; his response was "[j]ust anger, degrading me, demeaning me, threatening me, telling me I needed to watch my back, telling me I didn't know what he was capable of, and, you know, to always be ever mindful that he could do things to me that would be detrimental to me." Sandra "was terrorized."

Defendant would also show up to A.A. meetings Sandra attended. "[O]ftentimes he would sit . . . directly next to me and almost . . . lean on me and he would — on one occasion, came in with another individual who was wearing something that belonged to me and they would just sit like right next to me, like, you know, make their presence very apparent, and it was just so uncomfortable." At a meeting on August 31, 1995, he became angry with her. "[W]hen I was coming into the meeting, he was coming out the same door and he asked if he could speak to me and I told him no, just leave me alone, I just want to, you know, work on my recovery. And he had a cup of coffee in his hands and he threw it at me and — toward my upper torso and it hit me on my neck and upper chest, and then he kicked me in my leg." A restraining order was in place at that time, but it permitted defendant to come to the A.A. meetings she attended. After that incident, however, an additional ruling prohibited him from visiting that location.

A criminal case was eventually filed against defendant on her behalf. Even in court, "[w]hen he did show up, . . . he would make rude, denigrating comments toward me, toward my behavior, toward my actions, kind of announcing to the whole

room that, you know, I was the problem and he didn't know why he had to even be there." "And he would just remind me that he — you know, that I knew what he was capable of and that I needed to be very careful because he was capable of doing these things to me." Defendant was eventually convicted. The court in this case took judicial notice that "defendant Paul Baker was convicted on August 1st, 1996, . . . of misdemeanor stalking . . . and misdemeanor criminal threats." Sandra had no contact with defendant for several years after the conviction. The fact that defendant was convicted "weighed heavily in favor of admission" of the related evidence. (*Daveggio*, *supra*, 4 Cal.5th at p. 825.)

### c. *Lorna T.*

The jury found defendant guilty of sodomy by force regarding Lorna T. Lorna T. also testified regarding an uncharged incident in mid-1996, in which defendant stole her debit or credit card and was arrested. The court admitted this evidence under at least Evidence Code section 1101, subdivision (b). During closing argument, the prosecution relied on this act as evidence of "what type of intent the defendant had in his acts towards Judy Palmer, his reasons for entering the apartment." Defendant does not dispute that the evidence was relevant for that purpose. Any danger of undue prejudice, in the context of this case, is trivial.

### d. *Kathleen S.*

The jury found defendant guilty of two counts of sodomy by force and one count of forcible rape regarding Kathleen S. Between the first charged incident (in defendant's van) and the second charged incident (in the garage), Kathleen at some point decided she needed to leave her relationship with defendant.

She told defendant she was leaving him in May 1997. She left the van they were living in and crossed a street. By the time she reached the middle, he ran after her, grabbed her hair or head, and threw her to the ground. Her head hit the asphalt. Fortuitously, "at that same moment a police car was coming up the street toward her." Two officers exited their vehicle and arrested defendant. He was later convicted of misdemeanor battery. (See Pen. Code, §§ 242, 243, subd. (e).)

At some point after the June 1997 incident in the garage, Kathleen returned to work and rented a room from a couple she knew through church. Defendant — uninvited — came to the home she was renting on August 31, 1997. She "was leaving the house and I saw [defendant] coming toward me and I was trying to hurry up and get into the truck. And I don't know what he was yelling, but he grabbed the antenna as I started to pull away and then he hit the windshield and cracked it." She was "terrified," "afraid he was gonna hurt [her] again." The incident was reported to the police and defendant was eventually convicted of misdemeanor vandalism. Here, too, the convictions "weighed heavily in favor of admission" of the related evidence. (*Daveggio*, *supra*, 4 Cal.5th at p. 825.)

### e. Laura M.

The jury acquitted defendant of two counts of sodomy by force regarding Laura M. As defendant summarizes the evidence of uncharged acts, "Laura M. testified that, in 2000, [defendant] threatened her and stranded her in Las Vegas. [Citations.] She testified to three acts of sodomy [citations], whereas only two such acts were charged [citations]. She claimed [defendant] threatened to burn down her house."

The testimony regarding the Las Vegas incident was extremely brief and not inflammatory; in essence, it amounted to defendant threatened her and left her in Las Vegas. The evidence regarding a threat to burn down Laura M.'s house was also quite succinct. And that evidence was relevant to one of the charged offenses; when asked why she informed the police that she did not want to prosecute, Laura M. explained, "I was afraid because, you know, in the past he had said 'I'm gonna burn your house down.' You know, he was — he could be violent." The third act of sodomy regarded an incident in 2000, close in time to the charged offenses about which Laura M. testified. This testimony also was brief. Laura M. testified that she was in a camper and had been drinking; defendant forced her to have anal sex; and she ran away to a nearby A.A. venue where someone helped her get to a hotel. Cross-examination elicited that she did not call the police or seek medical attention and returned to the camper after one night at the hotel.

### f. Theresa T.

Much of the testimony by Theresa T. was relevant to the charged murder, separate and apart from any uncharged act. She first met defendant on about November 6, 2003, at an inexpensive hotel. They spent time together for roughly the next week, during which they used drugs. Defendant at some point disclosed that his last romantic relationship had been with Judy Palmer, whom Theresa knew from a sober living meeting and considered to be "an absolutely incredible lady." Near the beginning of the week Theresa and defendant spent together, around November 7 or 8, defendant went to Palmer's apartment. Palmer was not present. Defendant "used his credit card to get into the apartment and told [Theresa that Palmer] was letting him in because she left the deadbolt unlocked." Defendant

retrieved a duffel bag, what seemed to be a toothbrush, and possibly some underwear. He seemed "nervous" and "wanted to get out of there"; they left within five minutes of entering.

Theresa never returned to Palmer's apartment. But she and defendant spent time in a model unit, shown to prospective tenants, in Palmer's building. The model unit was directly below Palmer's. Theresa and defendant also occasionally used drugs in a stairwell within the complex during November 2003.

One morning that month, Theresa and defendant were lying side by side in the model unit. They had had sex consensually approximately once by that point and had made a few other attempts that were frustrated by drug use. Defendant said " 'I want some.' " Theresa was uncomfortable. When she said " 'not now,' " "he forced me over [onto her back] and pinned my shoulders down and he goes 'I want it.' " He was "[d]emanding and forceful." She unzipped her pants "and he had intercourse." Afterwards, she was "[v]ery mad, very disgusted." She never saw him after that night. He called her in December 2003. She told him to lose her number. All of these events occurred close in time to Palmer's April 2004 disappearance.

At some point in April 2004, Theresa became aware that Palmer was missing. Her first thought was "oh my God, Paul." She called homicide detectives at a number she saw on a "missing" poster. She did not disclose the rape until approximately November 20, 2007, thinking, at the time she spoke with detectives around April 2004, that finding Palmer was the priority. She also explained that at the time, she "wasn't really ready to face up to" what had happened.

### g. *Analysis*

The issue is whether the trial court abused its " 'broad discretion' " by not excluding some of this evidence as unduly prejudicial. (*People v. Loy* (2011) 52 Cal.4th 46, 64.) Defendant argues that evidence of spousal abuse is especially prejudicial, as is evidence of acts for which he had not been convicted and punished. But he does not argue that the probative value of any particular evidence was "substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice" (§ 352), nor does he explain why individually admissible pieces of evidence became inadmissible when viewed as a whole.

Without demonstrating that any individual piece of evidence has probative value substantially outweighed by the danger of undue prejudice, it may be difficult for a defendant to establish that adding pieces of evidence together results in an intolerable danger of undue prejudice. We do not hold, however, that a defendant could *never* show that at some point the unduly prejudicial effect of additional evidence would substantially outweigh that evidence's (perhaps cumulative) probative value. We hold only that defendant has not established an abuse of discretion on this record, considered as a whole.

As *Falsetta* explained, courts "must engage in a careful weighing process under section 352" when admitting propensity evidence. (*Falsetta, supra,* 21 Cal.4th at p. 917.) "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged

offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Ibid.*)

Before trial, the court carefully considered proffered evidence of uncharged misconduct. The court analyzed "each and every" act under Evidence Code sections 1108, 1109, and 1101, subdivision (b). It then evaluated the evidence under section 352, considering, among other things, the probative value of the testimony (including the remoteness of the incidents), its prejudicial effect, and the burden of mounting a defense. Pursuant to that analysis, the court declined to admit evidence that defendant: (i) surreptitiously followed and photographed a former romantic partner; (ii) recorded, without permission, an act of sexual intercourse between himself and another woman; (iii) entered that woman's home without her permission and at some point banged on her windows; (iv) tapped her phone line; (v) poisoned her cat, nearly killing it; (vi) punched his brother at his (defendant's) wedding for kissing the bride; (vii) fought with the husband of a neighbor with whom he (defendant) was having an affair; (viii) killed a puppy in the presence of his wife and two-year-old son because he was angry with her; and (ix) cut her telephone and electrical lines after they separated.

The court concluded that the uncharged acts it deemed admissible shed light on "defendant's propensity to engage in sexual assaults and domestic violence against Judy Palmer and the other victims named pursuant to Evidence Code 1108 and 1109." As it had earlier explained in ruling on some of the

evidence, "defendant has a pattern, a very demonstrable pattern of escalating violence towards women that he's been romantically involved with, tending to control these women, assaulting them physically, and sexually assaulting them particularly when they break up with him or rebuff him. [¶] He has an M.O. of preferring sodomy o[r] wanting to tie up women, breaking into their apartments, taking their property, and this appears to be a long-standing pattern." "Also," the court added, "the evidence is admissible in many instances to prove the defendant's motive, his intent, his common scheme or plan, lack of consent with regard to the sexual offenses, knowledge and in his attack on Judy Palmer and other named victims in the information. [¶] The court finds that the evidence is material, it's relevant, and its probative value outweighs any prejudicial effect on the defendant."

Regarding that prejudicial effect, the court explained, "I felt that all of the acts that I have admitted are not too inflammatory. They are the same or less serious conduct compared to the actual charged offenses, the murder and . . . all the sexual offenses[,] . . . some with convictions. [¶] I don't see any probability of confusion. I think it can be sufficiently laid out in a clear, understandable manner I think by the prosecution, particularly with the convictions, to show what acts are actually being charged . . . . [¶] I don't see undue consumption of time here. This is going to be a long case. Most of these acts are against already charged victims. They don't appear to be lengthy or complicated or will substantially confuse the jurors or consume an undue [amount] of time based upon the seriousness and the length of the case as it already stands." Regarding the remoteness of some of the acts, the court again stressed the similarity of the pattern of domestic violence and

abuse, as well as other corroboration, such as "witnesses, whether there were injuries, whether there were restraining orders, police reports filed, or whether there were convictions sought or obtained."

When additional instances of uncharged misconduct were discussed during trial, the court again paid careful attention to the probative and prejudicial value of that evidence. The court excluded evidence tending to show that defendant had slashed a woman's tires; potentially sodomized Laura M. on two other occasions; and burned down the shed in which Kathleen S. and two others were staying. And the court "certainly will not let in the racial slurs."

The trial court's decision to admit evidence of uncharged acts was bolstered by Palmer's death. "[T]he case for admission of propensity evidence 'is especially compelling' where, as here, '[a] sexual assault victim was killed and cannot testify.'" (*Daveggio*, *supra*, 4 Cal.5th at p. 824.) That principle applies with additional force in this case: the extensive decomposition of Palmer's body inhibited the search for physical evidence of sexual assault and cause of death.

To demonstrate error, defendant must show that the trial court abused its discretion when it did not exclude some unspecified portion of this evidence as having probative value "*substantially* outweighed by the probability that its admission will . . . create *substantial* danger of *undue* prejudice." (§ 352, italics added.) The claim is slippery. Defendant does not identify particular evidence that he thinks should have been excluded under section 352. He does not posit a point at which the evidence crossed the line between acceptable and excessive. And he does not appear to argue that the evidence should have

been excluded as confusing or unduly consumptive of time — only that, in the aggregate, it was unduly prejudicial. True, defendant argues that the evidence was significant. But to say that evidence was significant is not enough; as noted, " ' " ' "[e]vidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice." ' " ' " (*Daveggio, supra,* 4 Cal.5th at p. 824.)

It is apparent that the trial court painstakingly reviewed the proffered other-acts evidence and considered whether evidence should be excluded under section 352, as *Falsetta* requires. We conclude that, viewing the other-acts evidence as a whole, the trial court did not abuse its discretion by declining to exclude pieces of evidence based on the collective significance of that evidence. The trial court could have reasonably decided to further limit the other-acts testimony it admitted. But we cannot say that the trial court abused its discretion on this record, in the face of the precise claim of error now raised.

This conclusion makes it unnecessary to decide whether defendant, who at least perfunctorily objected to individual pieces of evidence (for example, "We'd object and submit"), raised an objection of this type below.

### E. Admissibility of DNA Evidence

Defendant claims the trial court erred by admitting evidence of DNA testing performed by analysts who were not called as witnesses at trial and, thus, were not subject to cross examination. That evidence included the testimony of Dr. Rick Staub regarding the analysts' testing and reports prepared by

the analysts themselves. The focus of the claim is *Crawford v. Washington* (2004) 541 U.S. 36, in which the high court held, as relevant, "that the admission of testimonial hearsay against a criminal defendant violates the Sixth Amendment right to confront and cross-examine witnesses." (*People v. Sanchez* (2016) 63 Cal.4th 665, 670.) Defendant also contends that the reports were not admissible as business records. We assume that these objections are preserved for our review but conclude that any error was harmless beyond a reasonable doubt.

### 1. *The DNA Evidence*

The evidence at issue concerns analysis performed in two Cellmark labs: one lab in Dallas, Texas, the other in Germantown, Maryland. The most notable evidence produced by the Dallas laboratory concerned Palmer's underwear. A profile of defendant, believed to be unique to him and to a subset of his male blood relatives, matched a sperm fraction extracted from cuttings of Palmer's underwear.

The most notable evidence produced by the Germantown laboratory concerned the vibrator found in Palmer's apartment. DNA on a swab of the vibrator matched defendant's DNA (in a sperm fraction) and Palmer's DNA (in a nonsperm fraction). The Germantown evidence also indicated that blood stains found in Palmer's apartment matched her DNA profile and that sperm on the rug matched defendant's.

During deliberations, the jury asked for a readback of Dr. Staub's testimony, specifically " 'the parts about the underwear and the [vibrator], especially the conclusions.' " During closing argument, the prosecution described evidence of "defendant's semen . . . in the seat of [Palmer's] panties" as "a bit of a problem for the defendant."

## 2. *Harmlessness*

The evidence that defendant killed Palmer was overwhelming. A criminalist testified that the DNA analysis she performed linked defendant to sperm fractions extracted from an aqua-colored blanket and towel cutting found near Palmer's body, as well as a nonsperm fraction from a nearby cigarette butt. Defendant's relationship with Palmer had failed and he was frantic to reconnect with her. The night she disappeared, he was seen with a Ford Ranger that she drove home that evening. Soon after she disappeared, he expressed consciousness of guilt, conveying to others that he was going to be on the news, was going to hell, or wanted to kill himself. He also told Mengoni not to worry about anyone showing up to testify regarding Palmer's missing Ford Escort, evincing special knowledge that Palmer, then missing, was already dead. That he had purchased rope of the kind found around Palmer's body further pointed toward his involvement in her killing.

To say that defendant killed Palmer, however, is not to say that he committed first degree murder, let alone special circumstance murder. The more significant question is whether the DNA evidence may have prejudiced the jury's assessment of whether defendant raped Palmer — an issue relevant to the felony murder theory of first degree murder; to the rape conviction and special circumstance; and to the burglary conviction and special circumstance.

Here too, however, there was no prejudice. The jury heard Calhoun's testimony that defendant admitted he had "beat the pussy up." Clearly admissible physical evidence corroborated that confession. As discussed above, a criminalist testified at trial that the DNA analysis she performed linked defendant to

sperm fractions extracted from an aqua-colored blanket and towel cutting found near Palmer's body. The profile common to defendant and the sperm fraction from the towel, she explained, would be expected to appear in only one in 740 quadrillion Caucasians. The criminalist also extracted a sperm fraction from cuttings of Palmer's underwear and concluded that defendant could "[]not be excluded" as the source of the partial profile she created from that fraction. None of that analysis was performed at the Germantown or Dallas labs at issue in this claim of error. All of it was performed by an analyst who testified at trial, subject to cross-examination.

Moreover, the jury heard ample evidence demonstrating defendant's propensity to commit sexual assault, something he did to "all of his women." And it learned the state of Palmer's clothing when she was found — shirt off, jeans pulled down to the thighs, fully exposing her underwear. Viewed in this context, any error in admitting additional DNA evidence was harmless beyond a reasonable doubt.

The harmlessness of any error in admitting the Germantown evidence is further confirmed by the jury's verdicts. The jury *acquitted* defendant of sexual penetration by foreign object. It found *not* true the sexual penetration by foreign object special circumstance allegation. Because the Germantown evidence — most significantly, evidence regarding the vibrator — did not persuade the jury that defendant had committed sexual penetration by a foreign object, it is difficult to see that evidence causing the jury to conclude that defendant committed rape or entered with intent to commit rape. Accordingly, even assuming error, no basis for reversal appears.

## F. Sufficiency of the Evidence that Defendant Raped Palmer

Defendant contends there is insufficient evidence that he raped or attempted to rape Palmer.  As discussed, we disagree.

"The test for evaluating a sufficiency of evidence claim is deferential: 'whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]  We must 'view the evidence in the light most favorable to the People' and 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'  [Citation].  We must also 'accept logical inferences that the jury might have drawn from the circumstantial evidence.' "  (*People v. Flores* (2020) 9 Cal.5th 371, 411.)

As noted, evidence that defendant raped Palmer included the sperm discovered in her apartment and on items found with her body; defendant's admission to Calhoun that he had "beat the pussy up"; defendant's propensity to commit sexual assault; and the state of Palmer's clothing when she was found.

Defendant argues that any sexual intercourse might have been consensual.  The jury could have rejected that contention based on the evidence that Palmer had ended her relationship with defendant and was afraid of him.  The fact of her murder — and the scratches observed on defendant's face — also suggest that any intercourse around the time she disappeared was rape.

Defendant contends there is no evidence regarding when any sperm was deposited.  But defendant's statement to Calhoun tended to indicate that he had sex with Palmer close in time to her disappearance, after their relationship had ended. The jury also heard testimony that the acid phosphatase in

semen "is water soluble and it tends to wash out." Accordingly, the fact that a towel and aqua blanket found near Palmer's body both screened positive using an acid phosphatase test tended to indicate that the sperm found on those items was deposited after the last time those items were washed. Testimony similarly conveyed that although sperm may remain after washing, each wash diminishes the likelihood of finding sperm.

Defendant next asserts that if Palmer had been raped, "it is likely that sperm would have been deposited in the crotch area" of her underwear, adding that the presence of sperm elsewhere in the underwear was "indicative of sexual conduct other than rape." (See *People v. Holt* (1997) 15 Cal.4th 619, 676 ["In this state rape and sodomy are distinct crimes"].) Putting this speculation aside, the jury was not required to conclude that the "sexual penetration, however slight," that is "sufficient to complete the crime" of rape resulted in any sperm at all, let alone sperm in a particular area of Palmer's underwear. (Pen. Code, § 263.) Nor was the jury required to assume that if defendant committed sodomy, he did not also commit rape. For example, the jury convicted defendant of both raping and sodomizing Kathleen S. during the incident in the garage.

Moreover, the jury heard Calhoun's testimony that defendant admitted to "beat[ing] the pussy up." Defendant argues that "no reasonable juror could have reasonably inferred" that defendant's statement to Calhoun meant that defendant had raped Palmer. But a reasonable juror could have understood the statement to be an admission that defendant and Palmer had vaginal sex — and relied on the surrounding circumstances to conclude that the sex was not consensual.

Finally, defendant contends there was no evidence that Palmer was alive when any intercourse occurred. " ' "[I]n the absence of any evidence suggesting that the victim's assailant intended to have sexual conduct with a corpse [citation], we believe that the jury could reasonably have inferred from the evidence that the assailant engaged in sexual conduct with the victim while [she] was still alive rather than after [she] was already dead." ' " (*People v. Ghobrial* (2018) 5 Cal.5th 250, 280.) Likewise, the jury could have reasonably inferred that because defendant committed the rape before killing Palmer, he also formed the intent to commit rape before she was dead.[7]

## G.  Burglary Felony Murder Instructions

The jury was permitted to find defendant guilty of first degree felony murder on a theory that the murder was committed during the commission of a burglary. The jury was also tasked with considering the truth of a burglary special circumstance allegation. In both contexts, the jury was instructed that defendant was guilty of burglary only if he entered with intent to commit (i) theft, (ii) rape, (iii) sexual penetration by a foreign object, or (iv) sodomy. Defendant argues that "[n]either a burglary-based felony murder nor a burglary special circumstance can properly be based on an entry with the intent to commit sexual assault." We disagree.[8]

---

[7]   Our conclusion that there was substantial evidence of a rape also addresses defendant's argument that the trial court should not have relied on the premise that the murder took place in the course of a rape when ruling on the automatic motion to modify the verdict. (See *post*, pt. II.K.)

[8]   Defendant contends that he may raise this issue on appeal even in the absence of an objection below. We assume without

The felony murder rule makes certain homicides murder (rather than manslaughter) and makes a subset of those homicides murder of the first degree. As relevant here, "[m]urder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) "Manslaughter is the unlawful killing of a human being without malice." (§ 192.) "Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1).) "Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) " 'The felony-murder rule imputes the requisite malice for a murder conviction to those who commit a homicide during the perpetration of a felony inherently dangerous to human life.' " (*People v. Chun* (2009) 45 Cal.4th 1172, 1184 (*Chun*).) A homicide committed during the perpetration of certain felonies enumerated by statute — including rape and burglary — is murder of the first degree. (§ 189, subd. (a).) A homicide committed during the perpetration of unenumerated inherently dangerous felonies is murder of the second degree. (*People v. Bryant* (2013) 56 Cal.4th 959, 966.) Only felonies "inherently dangerous to human life" are eligible for the felony murder rule. (*Id*. at p. 965; see *People v. Ford* (1964) 60 Cal.2d 772.) The merger doctrine applies to a subset of those felonies.

If construed broadly, the felony murder rule could threaten to collapse the distinction between murder (which requires malice) and manslaughter (which does not). The merger doctrine limits this threat. The thrust of the doctrine is

deciding that the claim of error has not been forfeited. (See *Daveggio, supra*, 4 Cal.5th at p. 845; Pen. Code, § 1259.)

that certain felonies " 'merge' with the homicide and cannot be used for purposes of felony murder." (*Chun, supra,* 45 Cal.4th at p. 1189; see also *People v. Wilson* (1969) 1 Cal.3d 431, 442, fn. 5 (*Wilson*) ["felonies that are an integral part of the homicide are merged in the homicide (italics omitted)"].) "In explaining the basis for the merger doctrine, courts and legal commentators reasoned that, because a homicide generally results from the commission of an assault, every felonious assault ending in death automatically would be elevated to murder in the event a felonious assault could serve as the predicate felony for purposes of the felony-murder doctrine. Consequently, application of the felony-murder rule to felonious assaults would usurp most of the law of homicide, relieve the prosecution in the great majority of homicide cases of the burden of having to prove malice in order to obtain a murder conviction, and thereby frustrate the Legislature's intent to punish certain felonious assaults resulting in death (those committed with malice aforethought, and therefore punishable as murder) more harshly than other felonious assaults that happened to result in death (those committed without malice aforethought, and therefore punishable as manslaughter)." (*People v. Hansen* (1994) 9 Cal.4th 300, 311–312, overruled by *Chun,* at p. 1199.) Some decisions also take the position that deterrence concerns cannot justify the felony murder rule when certain types of assaultive felonies are at issue, demanding "a felony independent of the homicide" to render the merger doctrine inapplicable. (*Wilson,* at p. 440; see also *ibid.* ["Where a person enters a building with an intent to assault his victim with a deadly weapon, he is not deterred by the felony-murder rule"]; but see *People v. Farley* (2009) 46 Cal.4th 1053, 1120 (*Farley*).)

This court embraced a version of the merger doctrine in *People v. Ireland* (1969) 70 Cal.2d 522 (*Ireland*). The instructions in *Ireland* permitted the jury to find a second degree murder if a killing resulted from an assault with a deadly weapon. (*Id.*, at p. 538.) We concluded that allowing the "use of the felony-murder rule" in such a case "would effectively preclude the jury from considering the issue of malice aforethought in all cases wherein homicide has been committed as a result of a felonious assault — a category which includes the great majority of all homicides." (*Id.*, at p. 539.) We forbade such "bootstrapping" in the circumstances relevant there. (*Ibid.*; see also *Wilson, supra,* 1 Cal.3d at p. 441 ["In *Ireland*, we rejected the bootstrap reasoning involved in taking an element of a homicide and using it as the underlying felony in a second degree felony-murder instruction"].)

Several months later, we extended *Ireland* to reach certain first degree felony murders based on burglary. (See *Wilson, supra,* 1 Cal.3d at p. 431.) The prosecution in *Wilson* "sought to apply the felony-murder rule on the theory that the homicide occurred in the course of a burglary, but the only basis for finding a felonious entry [was] the intent to commit an assault with a deadly weapon." (*Id.*, at p. 440.) We forbade reliance on a felony murder theory when, among other things, "the entry would be nonfelonious but for the intent to commit the assault." (*Ibid.*; see also *id.*, at p. 442 ["an instruction on first degree felony murder is improper when the underlying felony is burglary based upon an intention to assault the victim of the homicide with a deadly weapon"].) We reached this result even though, then as now, Penal Code section 189 defined first degree murder to include "[a]ll murder . . . which is committed

84

in the perpetration or attempt to perpetrate . . . burglary." (*Wilson*, at p. 441, fn. 4; see § 189.)

Stressing the clear language of Penal Code section 189, we eventually held in *Farley* that *Wilson* "erred in extending the merger doctrine to first degree felony murder." (*Farley*, *supra*, 46 Cal.4th at p. 1117; see *id.*, at pp. 1111–1122.) Because the defendant in *Farley* had committed his crimes in 1988, "at which time it was unforeseeable that we would overrule *Wilson*," our *Farley* decision did not apply to that defendant retroactively. (*Farley*, at p. 1122.) Likewise here: Although the merger doctrine no longer applies to first degree murder, we will apply *Wilson* as though it had not been overruled.

In the decades that *Wilson* remained good law, the contours of our merger doctrine evolved — and not always consistently. (See *Chun*, *supra*, 45 Cal.4th at pp. 1188–1201.) Regardless, defendant's position lacks merit under either of the analytical approaches we applied at the time he committed his offenses. First, defendant offers no reason to conclude that rape, sodomy, or penetration by foreign object are involved in "a high percentage of all homicides" (*id.*, at p. 1198), such that application of the felony murder rule to those offenses would remove the issue of malice aforethought from myriad homicide cases (*Ireland*, *supra*, 70 Cal.2d at p. 539). And second, in this particular case, there was evidence from which the jury could conclude that defendant had an independent purpose to commit rape, sodomy, or penetration by foreign object, separate and apart from any intent to assault or kill. (See *People v. Gonzales* (2011) 51 Cal.4th 894, 942 [even before *Farley*, *Wilson* was limited to situations in which "the defendant's *only* felonious purpose was to assault or kill the victim" (italics added)]; see also *Chun*, at pp. 1193–1195, 1197–1200; *People v. Smith* (1984)

35 Cal.3d 798, 806–807 ["child abuse of the assaultive variety" merged when court could "conceive of no independent purpose for the conduct"].)

True: rape, sodomy, and penetration by foreign object may fairly be termed "sexual assault," and so in some sense an intent to commit those offenses is assaultive in nature rather than independent of an assault. But as used in the context of the merger doctrine — a doctrine which, at least in part, guards the line between murder and manslaughter — the term "assault" captures only felonies that are more likely to prove fatal; if the felony is not sufficiently likely to prove fatal, it does not merge. We do not announce any precise test to determine which offenses trigger application of what remains of the merger doctrine after *Farley*. The point is merely that intent to commit rape, sodomy, and penetration by foreign object are not "assaultive" in the relevant sense; they reflect an independent intent for purposes of the merger doctrine. (Cf. *People v. Morgan* (2007) 42 Cal.4th 593, 619 [no merger problem because "unlawful penetration with a foreign object . . . embodies a separate felonious purpose apart from the intent to injure or kill"]; *People v. Holloway* (2004) 33 Cal.4th 96, 140 [no merger problem when the jury could find burglary only if there was entry with intent to commit rape].)

A notable omission from defendant's argument underscores the point. There is a certain symmetry between *Ireland* and *Wilson*: If assault with a deadly weapon merges (*Ireland*), then perhaps entry with intent to commit assault with a deadly weapon should merge as well (*Wilson*). (See *People v. Burton* (1971) 6 Cal.3d 375, 388.) But here, defendant does not dispute that rape itself may provide the basis for special-circumstance first degree felony murder. And if rape does not

merge, it is difficult to see why entry with intent to commit rape would.[9]

Defendant also argues there was insufficient evidence to support the court's instruction that the jury could consider whether defendant entered with intent to commit theft. He does not frame this as a standalone attack on the verdict, perhaps because any error here would obviously be harmless: The exacting *Chapman* harmlessness standard would not apply (see *People v. Guiton* (1993) 4 Cal.4th 1116, 1129–1130), and in any event, the rape conviction (with the burglary allegation) and rape special circumstance leave no reasonable doubt that the jury found defendant entered with intent to commit rape.

Instead, we understand defendant's insufficiency argument to be in service of his merger argument: The burglary was not based on entry with intent to commit theft, therefore it was based on entry with intent to commit sexual assault, thus the merger doctrine applies. Because the argument fails at the final step — there being no merger problem even if the burglary was based on entry with intent to commit rape, sodomy, or sexual penetration by foreign object — we need not catalog the evidence relevant to the theft instruction (such as the jewelry described by Calhoun and the theft from Lorna T.).

---

[9] The nature of defendant's argument that the special circumstance should merge is not entirely clear. He does not appear to argue that if the felony murder instruction was permissible, the special circumstance instruction was nevertheless flawed. The existence of an independent purpose would undermine any such argument as well. (See *People v. Farmer* (1989) 47 Cal.3d 888, 915; see also *People v. Clark* (1990) 50 Cal.3d 583, 608–609 & fn. 15.)

## H. Parole Revocation Fine

The trial court imposed a $10,000 parole revocation fine. Defendant claims that the fine is improper because, as a person sentenced to death, he is ineligible for parole. The claim fails under *People v. Brasure* because defendant was also sentenced to a determinate term. (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1075 (*Brasure*).) Defendant concedes that *Brasure* so holds and makes no effort to distinguish it. He instead criticizes *Brasure*'s statutory interpretation and contends that the case is in tension with *People v. McWhorter* (2009) 47 Cal.4th 318, 380 (*McWhorter*).

We decline to reconsider *Brasure*. As relevant here, *Brasure* reasoned that a determinate term carries with it a period of parole, triggering a parole revocation fine under Penal Code section 1202.45. (See *Brasure*, *supra*, 42 Cal.4th at p. 1075; see also Pen Code., § 1202.45, subd. (a) [requiring a fine "[i]n every case" in which a person's "sentence includes a period of parole"].) In *McWhorter*, we embraced a capital defendant's claim that a parole revocation fine should be stricken, reasoning, in full, that defendant "is correct. (See *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1184–1185 [83 Cal.Rptr.2d 157].) Respondent has conceded the point." (*McWhorter*, *supra*, 47 Cal.4th at p. 380.) As is apparent, *McWhorter* did not acknowledge the existence of *Brasure*; relied solely on a Court of Appeal decision (*Oganesyan*) that *Brasure* distinguished as involving "no determinate term of imprisonment imposed under [Penal Code] section 1170" (*Brasure*, at p. 1075); and never considered the significance of any determinate term, omitting mention of whether one had been imposed in connection with McWhorter's robbery conviction (see *McWhorter*, at pp. 324, 380). Because " ' "cases are not authority for propositions not

considered" ' " (*Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 127), *McWhorter* casts no doubt on the significance *Brasure* afforded to a defendant's determinate term. We note, too, that "[d]efendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked." (*Brasure*, at p. 1075.)[10]

## I. Error in Abstract of Judgment

Penal Code section 286 defines the crime of sodomy and addresses different circumstances in which the crime may be committed. One relevant circumstance is the age of the victim. (See, e.g., § 286, subd. (c).) The abstract of judgment indicates that defendant thrice committed sodomy with a person under 14 years of age. The parties agree that this was error; defendant's victims regarding the relevant counts (7, 10, and 16) were adults. "[A] court has the inherent power to correct clerical errors in its records so as to make these records reflect the true facts." (*In re Candelario* (1970) 3 Cal.3d 702, 705.) The abstract of judgment will be corrected to reflect that defendant was convicted under subdivision (c)(2) — sodomy by "force, violence, duress, menace, or fear of immediate and unlawful bodily injury."

## J. Evidence of Animal Abuse

Defendant complains that the trial court erred at the penalty phase by admitting evidence that he mistreated cats as

---

[10] Defendant does not contend that, and we do not address whether, any other intervening authority casts doubt on *Brasure*'s conclusion.

a child.  Even assuming the claim of error is preserved and has merit, any error was harmless beyond a reasonable doubt.

The prosecution sought to admit evidence of animal abuse through the testimony of defendant's half brother.  The evidence relevant here concerned tying cats' tails together and throwing the cats over a clothesline.  The prosecution contended that the evidence was relevant to the anticipated testimony of a defense expert psychologist.  Defense counsel conceded that he had provided the expert with a transcript of an interview in which the half brother discussed the tying together of cats' tails.  During a later colloquy, the prosecution stressed "that at no time have we said or do we intend to say that any of the things that the defendant did as a youth . . . fall under Factor B.  We are not characterizing them as aggravating factors."  The court allowed inquiry about the subject, but encouraged the prosecution to "try to minimize this testimony," cautioning that the court would "put a halt to it if it becomes too inflammatory."

The defense was the first to question the half brother regarding the subject.  In full: "Now, did you have occasion to see [defendant] — that you personally saw [defendant] get a couple cats and tie their tails and put them up on a clothesline or something?  [¶]  A[.]  Yeah.  It was getting ready to happen and I ran because I didn't want to see it. [¶]  Q[.]  Okay.  Did you actually see any — did you actually ever see anything that happened? [¶]  A[.]  No.  I ran. [¶]  Q[.]  Okay. [¶]  A[.]  But they were getting ready to do it."

The prosecution picked up where the defense left off.  Questioning elicited that defendant and a few other boys were in a backyard discussing tying cats' tails together and throwing the cats over a clothesline in that yard.  They were trying to

catch the cats and had something like "rope or twine." The half brother did not see defendant harm animals on other occasions.

The court later had doubts about its decision to admit this and other testimony regarding defendant's conduct during his childhood. The court ultimately instructed the jury that "[e]vidence has been presented regarding the defendant's background. This evidence may be considered by you, if at all, as mitigating evidence. [¶] I'm going to change that last sentence. [¶] This evidence may *only* be considered by you, if at all, as mitigating evidence." (Italics added.) The court also instructed that, other than certain crimes about which the jury heard evidence during the guilt phase, the jury should not "consider any other evidence pertaining to any other crimes on any alleged victim, whether charged or uncharged."

Considering all these circumstances, no basis for reversal appears. The testimony at issue was brief. It concerned the behavior of a group of boys, not solely defendant, an adult whom the jury had already convicted of murder, rape, and sodomy. The witness did not testify that the plan regarding cats was defendant's idea. Nor did he testify that any cats were ever caught, tied, or thrown. The prosecution asserted at trial that it sought to elicit this testimony solely for impeachment purposes. There is no dispute that the prosecution did not rely on the evidence regarding cats as evidence in aggravation during closing argument. The defense, by contrast, emphasized that "background information" is, if anything, "mitigation and only mitigation." Likewise, the court's instructions limited the significance that the jury could have given to this evidence. Viewed in context, any error in admitting this evidence of (potential) animal abuse was harmless beyond a reasonable doubt.

### K. Denial of Automatic Motion to Modify the Verdict

The trial court denied defendant's automatic motion to modify the verdict. (Pen. Code, § 190.4.) Defendant concedes that he did not object to the denial and that "[s]uch a failure generally constitutes forfeiture of the issue on appeal." (*People v. Sánchez* (2016) 63 Cal.4th 411, 485; *People v. Horning* (2004) 34 Cal.4th 871, 912 (*Horning*); *People v. Riel* (2000) 22 Cal.4th 1153, 1220.) He contends that the failure to object should be excused on grounds of futility, "given the trial court's adamant view of the case." We disagree. The trial court's belief that the motion should be denied does not indicate that the trial court could not have been persuaded otherwise after objection. The futility argument is particularly unconvincing to the extent defendant argues that the trial court's reasoning was marred by legal error; if informed of an actual legal error by an objection, presumably the court would have revisited its reasoning and, thus, its conclusion.

Defendant's claim fails on the merits in any event. He notes that the trial court concluded that the murder was premeditated, surmising that the court's view was based on evidence suggesting that defendant formed an intent to kill before entering Palmer's apartment. From this, he argues that the burglary special circumstance was inapplicable, citing *People v. Seaton* (2001) 26 Cal.4th 598, 646 for the proposition that "the burglary-murder special circumstance do[es] not apply to a burglary committed for the sole purpose of assaulting or killing" the homicide victim. The problem with defendant's argument is revealed by the language he quotes: "*sole* purpose." (*Ibid.*, italics added.) That defendant may have entered with

intent to kill does not eliminate the evidence of his entry with intent to commit sexual assault.

Defendant also faults the trial court for relying on a view that the treatment of Palmer's body made the crime " 'particularly heinous.' " In support, he relies on case law relevant to factors that render crimes death eligible; in the parlance of California law, special circumstances. (See *Maynard v. Cartwright* (1988) 486 U.S. 356, 363–364; *People v. Superior Court (Engert)* (1982) 31 Cal.3d 797; *People v. Green* (1980) 27 Cal.3d 1, 61 & fn. 51.) That authority is beside the point. As the other case he cites explains, "defendant argues that the trial court erred by considering the 'heinous' nature of the crimes as a factor in aggravation. . . . But the aggravating circumstance addressed in *Maynard* was one that determined eligibility for the death penalty, which requires greater precision than the factors that govern the sentence-selection process, at issue here. [Citations.] In any event, the trial court merely used the word 'heinous' . . . as part of its explanation why it found the circumstances of the offense an aggravating factor." (*People v. Lucero* (2000) 23 Cal.4th 692, 737 (*Lucero*).)[11]

Defendant also points to "significant mitigating evidence reducing his culpability." The trial court took such evidence into account. Finally, defendant contends that the evidence that "Palmer was beloved by her family and was a kind, generous, and loving individual" was "not sufficient to justify the decision

---

[11] Defendant also asserts that "a contention that a murder was 'particularly heinous' is vague and cannot support imposition of the death penalty." He identifies no authority in support of this proposition — a deficiency that would forfeit the issue on appeal even if it had not been forfeited below. (See *Daveggio, supra,* 4 Cal.5th at p. 830, fn. 6.)

not to modify the verdict." The trial court did not rely solely on that evidence to justify its decision. Our independent review reveals no reason to disturb the trial court's denial of the motion. (*People v. Sánchez, supra,* 63 Cal.4th at p. 485.)

### L. Victim Impact Evidence

Defendant contends that victim impact evidence must be limited to the facts or circumstances known to the accused at the time of the offense. The trial court's failure to embrace this principle, he continues, resulted in evidentiary and instructional error. We have rejected this contention in the past and see no persuasive reason to revisit our precedent. (See, e.g., *People v. Henriquez* (2017) 4 Cal.5th 1, 37–38; *People v. Pollock* (2004) 32 Cal.4th 1153, 1183.) Accordingly, there was no error.

### M. Cumulative Error

We have assumed that the trial court erred in admitting certain DNA evidence at the guilt phase and in admitting evidence of (potential) animal abuse at the penalty phase; held, in the alternative to a finding of no error, that any error in imposing a parole revocation fine was harmless; and confirmed that the abstract of judgment reflects a clerical error. We further conclude that, even viewed in combination, these errors (found or assumed) were not prejudicial. It is especially clear that the parole revocation fine and abstract of judgment could not have affected the jury's guilt or penalty verdict, and that the admission of animal abuse evidence at the penalty phase could not have affected the guilt phase verdict.

### N. Miscellaneous Challenges to the Death Penalty

Defendant raises several challenges to the legality of California's death penalty. We decline to revisit our precedent as follows:

Neither Penal Code section 190.2 nor Penal Code section 190.3 (including its factor (a)) is unconstitutionally vague. (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 198 (*Sivongxxay*); *People v. Myles* (2012) 53 Cal.4th 1181, 1224.) Section 190.3 "is not invalid for failing to specify which factors are mitigating and which are aggravating, to limit aggravation to the specified aggravating factors, or to define aggravation or mitigation." (*Horning, supra,* 34 Cal.4th at p. 913.) "Nor do these asserted deficiencies impermissibly allow the jury to consider mitigating evidence, or its absence, in aggravation." (*Myles,* at p. 1223.) "Moreover, neither the use of the adjective 'extreme' in 'extreme mental or emotional disturbance' under factor (d), nor the absence of language explaining that these identified circumstances are mitigating rather than aggravating, renders that factor unconstitutionally vague. Nor does the same asserted deficiency invalidate factor (h), regarding impairment due to mental disease, defect, or intoxication." (*Ibid.*) Defendant's further claim that "all the remaining factors in section 190.3 fail to pass constitutional scrutiny" is too cursory to require our discussion of each factor individually. (See *Myles,* at p. 1223, fn. 16; *People v. Jones* (2003) 30 Cal.4th 1084, 1129.)

"California's sentencing statute sets forth a constitutionally adequate burden of proof concerning the aggravating factors and the sentencer's ultimate decision." (*Sivongxxay, supra,* 3 Cal.5th at p. 198.) Written findings in support of the verdict are not required. (*Id.,* at p. 199; *People v. Potts* (2019) 6 Cal.5th 1012, 1061 (*Potts*).)

" ' "Comparative intercase proportionality review by the trial or appellate courts is not constitutionally required." ' " (*Potts, supra,* 6 Cal.5th at p. 1061.) A lack of such "review does

not deny a defendant the constitutional right to equal protection." (*People v. Romero* (2008) 44 Cal.4th 386, 429.)

The special circumstances that make an offense a capital crime adequately "narrow the class of persons eligible for the death penalty." (*People v. Mai*, *supra*, 57 Cal.4th at p. 1057; see also *People v. Stevens*, *supra*, 41 Cal.4th at p. 211; *Lucero*, *supra*, 23 Cal.4th at p. 740.) "Prosecutorial discretion to select those death-eligible cases in which the death penalty will actually be sought is not constitutionally impermissible." (*People v. Anderson* (2001) 25 Cal.4th 543, 601; see also *People v. Ayala* (2000) 23 Cal.4th 225, 304.) "To the extent defendant argues that the same incident may not be considered as a special circumstance and as an aggravating factor, he is incorrect." (*People v. Salazar* (2016) 63 Cal.4th 214, 254; see also *People v. Whalen*, *supra*, 56 Cal.4th at p. 89 [double jeopardy].)

Finally, "[t]he imposition of the death penalty under California's law does not violate international law or prevailing norms of decency." (*People v. Krebs* (2019) 8 Cal.5th 265, 351; see also, e.g., *People v. Rhoades*, *supra*, 8 Cal.5th at p. 456; *People v. Johnson* (2019) 8 Cal.5th 475, 528; *People v. Capers* (2019) 7 Cal.5th 989, 1017; *People v. Molano* (2019) 7 Cal.5th 620, 679.)

## III. DISPOSITION

The superior court is directed to amend the abstract of judgment to reflect the basis for defendant's convictions on counts 7, 10, and 16; and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

**CANTIL-SAKAUYE, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**
**HULL, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PEOPLE v. BAKER

S170280

Concurring Opinion by Justice Liu

In rejecting defendant's claims under *Batson v. Kentucky* (1986) 476 U.S. 79 and *People v. Wheeler* (1978) 22 Cal.3d 258, today's opinion accords deference to the trial court's ruling. (Maj. opn., *ante*, at p. 39.)  A trial court is required to make a " 'sincere and reasoned effort' " to assess the prosecutor's stated reasons for striking prospective jurors. (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1159.)  Today's opinion recites our precedent that " '[w]hen the trial court has inquired into the basis for an excusal, and a nondiscriminatory explanation has been provided, we . . . assume the court understands, and carries out, its duty to subject the proffered reasons to sincere and reasoned analysis, taking into account all the factors that bear on their credibility.' "  (Maj. opn., *ante*, at p. 39, quoting *People v. Mai* (2013) 57 Cal.4th 986, 1049, fn. 26 (*Mai*).)

I continue to believe the better rule is to require the trial court to affirmatively demonstrate on the record that it has made a sincere and reasoned effort to evaluate the prosecutor's explanations for a contested strike.  I see little in the way of meaningful appellate review when we assume, in the absence of any explicit record of reasoned analysis, that the trial court discharged its duty to undertake such analysis.  (See *People v. Miles* (2020) 9 Cal.5th 513, 612 (dis. opn. of Liu, J.) ["[B]ecause [the trial court's] ruling is not accompanied by any reasons or analysis, there is nothing to defer to."]; *Mai, supra,* 57 Cal.4th at p. 1060 (conc. opn. of Liu, J.) ["There is no *reasoning* in the

trial court's statement that 'no discriminatory intent is inherent in the explanations, and the reasons appear to be race neutral.' "].)  "There is a wide chasm . . . between the absence of reasons to conclude that the trial court did not conduct a proper *Batson* analysis and the presence of reasons to conclude that it did."  (*Mai,* at p. 1061 (conc. opn. of Liu, J.); see *People v. Williams* (2013) 56 Cal.4th 630, 709–717 (dis. opn. of Liu, J.).)

In this case, the court's discussion of deference notes that "indications in the record support an inference that the trial court had in mind the prospective jurors' demeanor and questionnaire answers when it evaluated the prosecutor's strikes of Prospective Jurors R.T. and T.P." (Maj. opn., *ante*, at p. 42.)  I would further note that even upon an independent review of the record, I would conclude that defendant has not shown by a preponderance of the evidence that the prosecutor's reasons for striking R.T. and T.P. were pretextual.  Accordingly, defendant's *Batson*/*Wheeler* claims must be rejected.

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Baker

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S170280
**Date Filed:** February 1, 2021

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Susan M. Speer

_____

**Counsel:**

John F. Schuck, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler and Lance E. Winters, Chief Assistant Attorneys General, Susan Sullivan Pithey, Assistant Attorney General, Joseph P. Lee, Scott A. Taryle and E. Carlos Dominguez, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John F. Schuck
Law Offices of John F. Schuck
885 N. San Antonio Road, Suite A
Los Altos, Ca 94022
(650) 383-5325

E. Carlos Dominguez
Deputy Attorney General
300 South Spring St., Suite 1702
Los Angeles, CA 90013
(213) 269-6120